DATO, J.
*894 Dr. Leah Levi, a neuro-ophthalmologist, appeals from a summary judgment in favor of her former employer, the Regents of the University of California (Regents), and Dr. Robert Weinreb, the chair of the department of ophthalmology at the University of California, San Diego (University). Levi asserted various causes of action against the Regents and Weinreb related to discrimination, harassment, retaliation, and due process violations. The retaliation claims alleged protected conduct under both California's Whistleblower Protection Act ( Gov. Code, § 8547 et seq. (CWPA)) and Fair Employment and Housing Act ( Gov. Code, § 12900 et seq. (FEHA)).
Levi contends the trial court granted summary judgment based on its mistaken application of the law. She argues she raised factual issues as to *895 each of her causes of action, including (1) whether she engaged in a protected activity under the FEHA and whether that activity was connected to an adverse employment action; (2) whether she made a protected disclosure of improper governmental activity or a condition threatening the health and safety of the public to support her CWPA retaliation claim; (3) whether the Regents' proffered nondiscriminatory reasons for taking adverse employment actions against *580 her were merely a pretext; (4) whether she was subjected to unwelcome conduct due to her gender that was severe enough or sufficiently pervasive to alter the conditions of her employment; (5) whether the Regents took reasonable steps to prevent discrimination, retaliation, and harassment; (6) whether the Regents and Weinreb denied her due process by failing to issue reports on grievances she had filed, failing to provide her notice before reducing her salary and appointment, and failing to provide her an opportunity to cure deficiencies and return to good standing; and (7) whether the Regents and Weinreb interfered with her constitutional and statutory rights by threats, intimidation, or coercion. We conclude Levi raised triable issues of fact sufficient to defeat summary judgment on her second cause of action for retaliation under the CWPA and sixth cause of action for due process violations. Accordingly, we reverse the trial court's order granting summary judgment and direct the court to grant Weinreb and the Regents' alternative motion for summary adjudication on Levi's remaining causes of action for retaliation under the FEHA, gender discrimination, gender harassment, failure to prevent harassment, discrimination, retaliation, and Tom Bane Civil Rights Act ( Civ. Code, § 52.1 (Bane Act)) violations.
FACTUAL AND PROCEDURAL BACKGROUND
Levi's Complaints Against Weinreb
In 1990, Levi joined the department of ophthalmology at the University as an assistant professor in residence. In 2003, she was appointed as the residency program director for the department and earned a stipend for the position. Weinreb had been on the faculty with the department of ophthalmology since 1984. In 2009, Weinreb's wife, Dr. Cristiana Vasile, applied for a resident position in the department. Levi asked Weinreb to recuse himself from the resident selection process to avoid inferences of impropriety.
As a result of Vasile's residency application, the University received an anonymous whistleblower complaint in 2009 alleging Weinreb had a conflict of interest because he was the vice chair of the department at that time. The University conducted an investigation regarding the complaint and Levi participated in that investigation. After the University informed Weinreb about the complaint, he questioned Levi about it. The investigation concluded that the whistleblower's claims were unsubstantiated.
*896 Vasile was ultimately accepted into the residency program with a standard condition that she complete a one-year internship prior to starting the ophthalmology program. The University's internal medicine department requested that the ophthalmology department pay for Vasile's internship position. Thus, Weinreb transferred discretionary funds he had control over to the internal medicine department to pay for Vasile's internship at the University.
In 2011, Weinreb was appointed chair of the ophthalmology department. Shortly thereafter he made changes to the residency program, including delaying the orientation schedule and modifying policies pertaining to resident vacations, calls, and patient triaging. These changes benefited Vasile. When Levi told Weinreb that any change in the patient triaging policy had to be structured to ensure resident accountability and patient safety, Weinreb became angry and said, " 'I think I made myself clear.' "
In July 2011, Weinreb met with Levi and informed her that the residency program was " 'awful and embarrassing.' "
*581 Levi was surprised to hear Weinreb say that residents and faculty could not work with her. Levi had earned teaching awards and positive evaluations from a majority of the faculty. When Levi challenged Weinreb's characterization of the program and her relationships with colleagues, Weinreb stood up, banged his fist on the table in front of Levi and said, " 'I can remove you as [program director] if you keep fighting me every step of the way.' " Levi felt frightened, intimidated, and threatened by Weinreb. Weinreb calmed down after Levi asked him if he was threatening her and the meeting continued. Weinreb and Levi went on to discuss the appointment of an assistant residency program director.
During the July 2011 meeting, Weinreb and Levi also discussed Levi's clinical practice. At the time, Levi was seeing approximately 16 patients per week at University clinics. Weinreb asked Levi if she could see more patients. Levi knew that unlike most of the department faculty, her clinical practice did not cover her salary. She believed that increasing her patient load would decrease the amount of time she spent with each patient and impact the quality of care she provided. She also thought that Weinreb, as a glaucoma specialist, was not in a position to tell her, a neuro-ophthalmologist, how to practice.
Levi's relationship with Weinreb improved temporarily. Weinreb made positive comments about Levi to others and asked Levi to review important documents.
Around March 2012, the University received two more whistleblower complaints regarding Weinreb. One complaint alleged that Weinreb was *897 showing favoritism toward Vasile, and the other alleged that the faculty was afraid to frankly evaluate Vasile because of possible retaliation by Weinreb. Levi did not make the complaints. Weinreb wondered whether Levi had filed the complaints and was furious about them.
In April 2012, Weinreb asked Levi to stay on as resident program director for one more year to continue mentoring Dr. Jeff Lee, who had been appointed assistant program director in August 2011. A month later, Weinreb and another physician met with Levi and told her to step down as program director. However, Levi informed them that she had no intention of stepping down. Weinreb and the other physician told Levi that it was time for a change in leadership, resident test scores were low, and the residency program was not attracting high-quality applicants. In June 2012, Weinreb removed Levi as program director and shortly thereafter appointed Lee to replace her.
Immediately following her dismissal as program director, Levi filed three anonymous whistleblower complaints in one day against Weinreb. One complaint alleged Weinreb engaged in a "[c]oncerted effort" to dismiss Levi as program director as a result of prior whistleblower complaints that Weinreb believed Levi had filed. Another complaint alleged that decisionmaking in the ophthalmology department favored Weinreb's wife. The third complaint alleged Weinreb engaged in abusive behavior designed to intimidate people. Specifically, Levi claimed Weinreb attempted to undermine staff members' confidence, yelled at people, targeted people who he perceived were aligned with the prior chair of the ophthalmology department, and fired people who disagreed with him. In July 2012, shortly after filing her three anonymous whistleblower complaints, Levi filed another complaint with the office of the "Locally Designated Official" (LDO).
Irene Levintov from the University president's office investigated Levi's allegations to the LDO. Levi had alleged Weinreb behaved in an " 'intimidating and *582 threatening manner,' " said " 'hurtful things,' " created " 'a hostile work environment,' " and was a " 'bully.' " In the LDO complaint, Levi also expressed concern that Weinreb retaliated against her by removing her from her position as residency program director because he believed she had filed prior whistleblower complaints against him alleging a conflict of interest. Levintov concluded Levi's allegations did not rise to the level of improper governmental activity and were not substantiated. However, based on her investigation, Levintov concluded that Weinreb was a bully and created a stressful and hostile work environment. Levintov indicated that her definition of "hostile" was not in a "legal sense."
In September 2012, Levi filed a grievance alleging many of the same claims as her June and July 2012 complaints. Levi also alleged that Weinreb had funded Vasile's internship position in the internal medicine department.
*898 In March 2013, Levi filed a complaint alleging that Weinreb retaliated against her for being a whistleblower. Specifically, Levi claimed that Weinreb excluded her from interviewing applicants for the residency program, excluded her from committees, and did not ask her to speak at a conference that he had organized with another physician.
Levi's Salary and Appointment Reduction
Levi had a split appointment between the University and the VA San Diego Healthcare System (VA), an affiliate of the University. Under the split appointment plan, the University counted service to the VA as part of a faculty member's commitment or "effort" to the University. The split appointment plan allowed for up to a maximum of 150 percent appointment split between the University and the VA. However, the University recognized a full-time faculty member's professional commitment or "effort" as 100 percent, even if the appointment between the VA and the University exceeded 100 percent. Thus, a faculty member could hold a 100 percent appointment at the University and a 50 percent appointment at the VA, but the total commitment to the University remained 100 percent. Levi had a 150 percent appointment, which included 100 percent to the University and 50 percent to the VA.
Levi's clinical practice was insufficient to cover her costs, resulting in a deficit to the department of ophthalmology. Levi knew that she had been in deficit for many years, but believed it was not a problem for the department. In June 2012, Weinreb and Catherine Ledford, the ophthalmology department's administrative vice chair, met with Ron Espiritu, the associate vice chancellor for the University health sciences' business and fiscal affairs, to discuss financially underperforming faculty, including Levi, and recommendations for remediation. Although there was enough patient volume for Levi to increase her patient visits, she was unwilling to see additional patients. Thus, Espiritu said the department could reduce Levi's University appointment from 100 percent to 50 percent to address her deficit.
Weinreb and Ledford met with Dr. Andrew Ries, associate vice chancellor for academic affairs, who was responsible for overseeing academic appointments and any actions that could involve a change in an academic appointment. Ries confirmed that the department could reduce Levi's University appointment from 100 percent to 50 percent due to Levi's inability to generate sufficient revenue to cover her costs. According to Ries, the change did not constitute an involuntary reduction of time because her total commitment to the University remained at 100 percent, split *583 evenly between the University and the VA. Further, because Levi's salary after reduction of her University appointment still exceeded her guaranteed covered compensation, *899 the change was not considered a layoff or a reduction in time or salary. Ries testified that the University reduced Levi's salary due to lack of sufficient funds to cover the cost of her University appointment, not as a corrective action.
At a meeting in October 2012, Weinreb stated that three faculty members were in deficit. Levi knew that she was one of those faculty members. She also knew that at least three male faculty members had previously been told they were in deficit. Two of those male faculty members resolved their deficit by cutting expenses or reducing their salary.
In March 2013, Levi received a letter from Espiritu, confirming that Levi's practice did not cover her base salary and expenses, and that the ophthalmology department had subsidized her costs. The letter informed Levi that because she was not covering her base salary, her University appointment would be reduced from 100 percent to 50 percent and her VA appointment would remain unchanged. As a result, Levi's salary would be adjusted to reflect the reduced University appointment. The letter went on to state that Dr. William Freeman, vice chair, would meet with Levi to discuss a plan to provide her additional clinic time and space in order for her to resolve her deficit. Further, Freeman would continue to meet with Levi monthly to monitor her progress and assist her in meeting her goals. Even with the University appointment and salary reductions, Levi's projected revenue would not cover her costs. Thus, the department would continue to provide Levi a subsidy of approximately $15,000 per year. The two other faculty members in deficit did not receive a letter similar to the one Espiritu sent to Levi.
In April 2013, Levi's attorney sent a letter to Espiritu challenging Levi's University appointment reduction and demanding that Levi be reinstated as the residency program director. The letter alleged that the Regents and University's conduct constituted retaliation, harassment, and gender and age discrimination.
Levi met with Freeman in June 2013. During the meeting, Freeman and Levi discussed increasing Levi's clinical income. Levi said that in order for her to see more patients, she needed more space and technical help. Freeman suggested other options for Levi to increase her revenue.
In June 2013, Levi resigned effective July 1 of that year. She felt that she had fulfilled the requirements of a faculty member, but continued to face hurdles at the University such as having her appointment reduced and being dismissed as residency program director. She acknowledged that between March and June 2013 there was nothing inappropriate or problematic about her work environment.
*900 Levi's Complaint and the Motion for Summary Judgment
In August 2014, Levi filed an action against the Regents and Weinreb. In the operative amended complaint, she alleged causes of action against the Regents for retaliation under the FEHA; gender discrimination; and failure to prevent harassment, discrimination, and retaliation. She also asserted claims for retaliation under the CWPA, gender harassment, violation of due process, and violation of the Bane Act against both the Regents and Weinreb.
Defendants moved for summary judgment or alternatively for summary adjudication of issues. They argued Levi could *584 not state a prima facie case of retaliation under the FEHA because she did not engage in a protected activity, there was no causal connection between an adverse employment action and a protected activity, and the Regents had a legitimate business reason for her termination. Defendants claimed that Levi's second cause of action for retaliation in violation of the CWPA failed because her only disclosure of improper governmental activity was her April 2013 complaint involving gender discrimination, and there was no causal connection between that complaint and an adverse employment action. On Levi's claim of gender discrimination, the Regents argued Levi could not establish that she was constructively terminated or suffered an adverse employment action motivated by her gender. The Regents further asserted they had legitimate, nondiscriminatory reasons for their employment decisions, and Levi could not establish pretext. The Regents and Weinreb contended that Levi's gender harassment claim failed because she could not show conduct by Weinreb that was sufficiently severe or pervasive to rise to the level of harassment. According to defendants, Levi's failure to show harassment, discrimination and retaliation precluded her claim for failure to prevent such conduct. On Levi's due process cause of action, the defendants argued the notice and opportunity to cure provisions in the University's policies did not apply to Levi because her base salary was not reduced and her appointment remained at the guaranteed level of 100 percent. Lastly, defendants asserted that Levi's Bane Act claim failed because she could not show they interfered with her constitutional or statutory rights, and that any alleged interference was unaccompanied by actual or attempted threats, intimidation, or coercion.
Levi opposed the motion. She also filed multiple objections to each of five declarations the Regents and Weinreb submitted in support of their motion. The objections did not quote or set forth the objectionable statements or material. Instead, Levi only identified paragraph numbers within the declarations.
In its tentative decision, the trial court overruled Levi's evidentiary objections based on her failure to comply with *901 California Rules of Court, rule 3.1354(b),[1] which requires the objecting party to, among other things, quote or set forth the objectionable statements or material. At the hearing on the summary judgment motion, Levi submitted revised evidentiary objections to three of the five declarations. The revised objections quoted the objectionable statements in each declaration. The court informed Levi's counsel that it did not think Levi was entitled to file objections twice, but she could "file whatever [she thought she] need[ed] to file."
After hearing arguments on the motion, the court granted summary judgment and overruled Levi's evidentiary objections based on her failure to comply with rule 3.1354(b). The court also found Levi's revised evidentiary objections, filed at the time of the hearing on the summary judgment motion, were untimely under rule 3.1354(a), and that Levi had not established good cause for the untimely filing of the objections.
DISCUSSION
"We review a summary judgment or summary adjudication ruling de novo to determine whether there is a triable issue as to any material fact and whether the moving party is entitled to judgment as a matter of law. [Citation.] 'In practical effect, we assume the role of a trial court *585 and apply the same rules and standards which govern a trial court's determination of a motion for summary judgment.' [Citation.] '[W]e are not bound by the trial court's stated reasons for its ruling on the motion; we review only the trial court's ruling and not its rationale.' " ( Mills v. U.S. Bank (2008) 166 Cal.App.4th 871, 895, 83 Cal.Rptr.3d 146.) "In performing our de novo review, we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing [plaintiff's] evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor." ( Saelzler v. Advanced Group 400 (2001) 25 Cal.4th 763, 768, 107 Cal.Rptr.2d 617, 23 P.3d 1143 ; Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826, 843, 107 Cal.Rptr.2d 841, 24 P.3d 493.)
I. FEHA Retaliation Claim**
II. CWPA Retaliation Claim
Levi argues the trial court erred in granting summary judgment on her claim of retaliation under the CWPA based on the trial court's finding that *902 she did not make a protected disclosure of improper governmental activity. She also contends the trial court failed to consider that her complaints alleged health and safety concerns, which constituted protected disclosures under the CWPA. Lastly, she argues the trial court failed to consider her good faith belief that she participated in protected disclosures.
The CWPA "prohibits retaliation against state employees who 'report waste, fraud, abuse of authority, violation of law, or threat to public health [citation]." ( Miklosy v. Regents of University of California (2008) 44 Cal.4th 876, 882, 80 Cal.Rptr.3d 690, 188 P.3d 629.) A protected disclosure under the CWPA is "a good faith communication, including a communication based on, or when carrying out, job duties, that discloses or demonstrates an intention to disclose information that may evidence (1) an improper governmental activity, or (2) a condition that may significantly threaten the health or safety of employees or the public if the disclosure or intention to disclose was made for the purpose of remedying that condition." ( Gov. Code, § 8547.2, subd. (e).)
Under Government Code section 8547.2, subdivision (c), " '[i]mproper governmental activity' means an activity by a state agency or by an employee that is undertaken in the performance of the employee's duties, undertaken inside a state office, or, if undertaken outside a state office by the employee, directly relates to state government, whether or not that activity is within the scope of his or her employment, and that (1) is in violation of any state or federal law or regulation, including, but not limited to, corruption, malfeasance, bribery, theft of government property, fraudulent claims, fraud, coercion, conversion, malicious prosecution, misuse of government property, or willful omission to perform duty, (2) is in violation of an Executive order of the Governor, a California Rule of Court, or any policy or procedure mandated by the State Administrative Manual or State Contracting Manual, or (3) is economically wasteful, involves gross misconduct, incompetency, or inefficiency."
Levi based her retaliation claim under the CWPA on the same investigations, complaints, and grievances as her retaliation claim under the FEHA. Those complaints and grievances alleged: (1) Weinreb had a conflict of interest related to Vasile's residency application because he was the vice-chair of the ophthalmology department *586 at the time; (2) Weinreb showed favoritism toward Vasile by changing department policies to benefit her; (3) faculty members were afraid to fairly evaluate Vasile because of possible retaliation by Weinreb; (4) Weinreb retaliated against Levi because he thought she was a whistleblower; (5) Weinreb engaged in abusive behavior to intimidate people; and (6) Weinreb improperly funded Vasile's internship position with money from the internal medicine department. *903 Levi argues her complaints and those in which she participated were disclosures of improper governmental activities because they alleged violations of state laws. Specifically, she contends the complaints at issue implicated violations of the Regents' conflict of interest, near relative, code of conduct, whistleblower, and nondiscrimination policies, which have the effect of statutes. In making this argument, Levi relies on a series of cases in which courts have concluded that the Regents' " 'policies and procedures have the force and effect of statute.' " ( Lachtman v. Regents of University of California (2007) 158 Cal.App.4th 187, 198, 207, 70 Cal.Rptr.3d 147 ( Lachtman ); see also Regents of University of California v. City of Santa Monica (1978) 77 Cal.App.3d 130, 135, 143 Cal.Rptr. 276 ( City of Santa Monica ); Kim v. Regents of University of California (2000) 80 Cal.App.4th 160, 165, 95 Cal.Rptr.2d 10 ( Kim ); People v. Lofchie (2014) 229 Cal.App.4th 240, 260, 176 Cal.Rptr.3d 579 ( Lofchie ).)
The Regents contend that if complaints about violations of the Regents' policies constituted protected activities under the CWPA, it would lead to absurd results. For example, the Regents emphasize that if complaints about minor violations of the Regents' policies, such as parking without a permit, establish a protected activity, it would result in countless lawsuits under the CWPA. While the Regents' argument has some intuitive appeal, we find Levi's argument has merit to the extent she complained about or participated in complaints that serve the public's interest and went beyond mere administrative or personnel matters. (See Gov. Code, § 8547.1 ["[P]ublic servants best serve the citizenry when they can be candid and honest without reservation in conducting the people's business."].)
The University of California " 'is a statewide administrative agency with constitutionally derived powers. [Citations.] Its employees are public employees. [Citation.] The University is administered by the Regents. [Citation.] Regents have rulemaking and policymaking power in regard to the University; their policies and procedures have the force and effect of statute. [Citation.]' " ( Lachtman, supra , 158 Cal.App.4th at pp. 198, 207, 70 Cal.Rptr.3d 147 [Regents' policies that controlled the terms of plaintiff's employment had the force and effect of statutes]; see also Kim, supra , 80 Cal.App.4th at p. 164, 95 Cal.Rptr.2d 10 [same]; City of Santa Monica, supra , 77 Cal.App.3d at p. 135, 143 Cal.Rptr. 276 [" ' "[T]he power of the Regents to operate, control, and administer the University is virtually exclusive" ' " and "policies established by the Regents as matters of internal regulation may enjoy a status equivalent to that of state statutes [citation]."].)
Here, the complaints and grievances Levi filed or participated in alleged Weinreb had a conflict of interest in Vasile's residency application, made department decisions to favor Vasile, retaliated against Levi for being a *904 whistleblower, and was generally a bully who intimidated people. In our view, complaints that Weinreb created a stressful work environment by yelling, undermining employees' confidence through statements that they were *587 performing poorly, and saying hurtful things are not protected disclosures under the CWPA, even if the conduct violated the Regents' policies, because the complaints are "akin to internal personnel or administrative disclosures." ( Conn v. Western Placer Unified School Dist . (2010) 186 Cal.App.4th 1163, 1182, 113 Cal.Rptr.3d 116.) Complaints made "in the context of internal administrative or personnel actions, rather than in the context of legal violations" do not constitute protected whistleblowing. ( Ibid. ; Patten v. Grant Joint Union High School Dist. (2005) 134 Cal.App.4th 1378, 1385, 37 Cal.Rptr.3d 113.) "To exalt these exclusively internal personnel disclosures with whistleblower status would create all sorts of mischief. Most damagingly, it would thrust the judiciary into micromanaging employment practices and create a legion of undeserving protected 'whistleblowers' arising from the routine workings and communications of the job site." ( Patten, at p. 1385, 37 Cal.Rptr.3d 113 [considering protected activity for whistleblower retaliation claim under Lab. Code, § 1102.5, subd. (b) ].)
In contrast, the complaints Levi filed or participated in-alleging Weinreb had conflicts of interest related to Vasile's residency application, modified policies to favor Vasile, retaliated against Levi for being a whistleblower or participating in whistleblower investigations, and improperly funded Vasile's internship at the University-implicated policies that have the force and effect of statutes.
In Lofchie , the court examined several of the Regents' policies at issue in this case, including policies concerning conflicts of interest and restrictions on staff participation in employment decisions involving near relatives. ( Lofchie, supra , 229 Cal.App.4th at p. 260, 176 Cal.Rptr.3d 579.) The issue was whether a University "faculty member may be criminally prosecuted under Government Code section 1090 for participating in a decision to hire his wife as a program assistant for a four-week study abroad course." ( Lofchie, supra , 229 Cal.App.4th at p. 245, 176 Cal.Rptr.3d 579, fn. omitted.) In concluding that the faculty member could not be criminally prosecuted, the court noted that "the University has adopted detailed conflict of interest policies, including policies and procedures governing the employment of relatives and near relatives of University employees," which could subject a violator to discipline. ( Id. at p. 260, 176 Cal.Rptr.3d 579.) "Allowing the People to sanction [the faculty member] under [Government Code] section 1090 would infringe upon not only the University's conflict of interest policies, but its internal disciplinary policies as well. These policies 'enjoy a status equivalent to that of state statutes. [citation.]' [Citation.] Their impairment would substantially interfere with the Regents' full powers of governance over University affairs." ( Ibid. ) In other words, *905 Government Code section 1090 did not apply because there was a corresponding Regents' policy that was the functional "equivalent" of the otherwise applicable state statute.
Although Lofchie did not consider the Regents' conflict of interest and near relative policies in the context of the CWPA, we see no reason to depart from the conclusion that those policies enjoy a status equivalent to state statutes for purposes of whistleblower protection. (See Lofchie, supra , 229 Cal.App.4th at p. 260, 176 Cal.Rptr.3d 579.) Exposing conflicts of interest, misuse of funds, and improper favoritism of a near relative at a public agency are matters of significant public concern that go well beyond the scope of a similar problem at a purely private institution. State employees should be free to report violations of those policies without fear of retribution. ( Gov. Code, § 8547.1.) At least *588 where the Regents' policy being relied on corresponds to a more general policy reflected in state statutes applicable to other state entities, complaints about their violations may constitute protected activities under the CWPA.
Based on our conclusion that Levi raised a triable issue of fact as to whether she made or participated in complaints that constituted protected disclosures under the CWPA, we need not consider Levi's contention that the trial court erred by failing to consider that she had a good faith belief that she made or participated in a protected disclosure under the CWPA.[3]
Lastly, a triable issue of facts exists as to whether Levi suffered retaliation as a result of the whistleblower complaints she filed or in which she participated. There was evidence she suffered at least one adverse employment action, including her removal as residency program director and her reduction in salary and appointment, after making or participating in a protected disclosure. The timing and circumstances surrounding the employment actions raise at least a reasonable inference that they could be connected to the protected activities.
III.-IX.***
*906 DISPOSITION
The judgment is reversed and the order granting defendants' motion for summary judgment on Levi's amended complaint is vacated. The court is directed to enter a new order denying defendants' motion for summary judgment and granting their alternative motion for summary adjudication as to Levi's first cause of action for retaliation under the FEHA, third cause of action for gender discrimination, fourth cause of action for gender harassment, fifth cause of action for failure to prevent harassment, discrimination, and retaliation, and seventh cause of action for Bane Act violations. Levi is awarded her costs on appeal.
WE CONCUR:
BENKE, Acting P. J.
AARON, J.

All further rule references are to the California Rules of Court.

See footnote *, ante.

Levi also asserts for the first time on appeal that the complaints she participated in and filed in 2012 disclosed health and safety issues for University personnel and the public. Specifically, she contends patient health and safety were at risk because faculty and staff could not fairly evaluate Vasile or speak up about her errors. Even if Levi did not forfeit this theory by failing to raise it in the trial court, it has no merit. Even broadly construing the complaints in this case, Levi did not complain or participate in a complaint that made allegations concerning patient health and safety.

See footnote *, ante.