Filed 12/3/20  Limon v. Dept. of Corrections and Rehabilitation CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ALBERTO LIMON, | D076479 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2018-00029993-CU-OE-CTL) |
| DEPARTMENT OF CORRECTIONS AND REHABILITATION, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, John S. Meyer, Judge.  Reversed.

Laurence F. Haines for Plaintiff and Appellant.

Xavier Becerra, Attorney General, Chris A. Knudsen, Assistant Attorney General, Celine M. Cooper, and Elizabeth Vann, Deputy Attorneys General, for Defendant and Respondent.

Alberto Limon, a former correctional officer employed by the California Department of Corrections and Rehabilitation (CDCR), photographed fellow officers, including some supervisors, sleeping on duty—some even with

pillows.  After Limon reported these officers to his supervisor, Captain Jose Badilla, a rat trap was placed on Limon's seat; his name was scratched off his CDCR mailbox; and supervisors forced Limon to work several days in uniform, but without a gun and a baton to protect himself from prison inmates.

Displeased with CDCR's handling of the matter, Limon appeared on a television news program with 10 photographs of sleeping prison guards.  The associate warden called the broadcast "an embarrassment" to the CDCR and to the unit Badilla supervises.

CDCR reprimanded the sleeping officers with a temporary pay cut—but terminated Limon.  CDCR fired Limon for "dishonestly" stating during an internal investigation that he reported *all* of the officers whose photographs were displayed on television, whereas Badilla told investigators that Limon had only reported three of them.  In effect, Limon lost his 15-year law enforcement career because Badilla stated that he reported too few sleeping prison guards.

Invoking the California Whistleblower Protection Act (the Act), Government Code[1] section 8547 et seq., Limon sued CDCR for wrongful termination.  The trial court granted CDCR's motion for summary judgment after determining there was "no evidence" that CDCR's stated reason for terminating Limon—officer dishonesty—was a pretext.

We reverse because there is substantial evidence from which a jury could reasonably conclude that CDCR terminated Limon to retaliate for his reporting fellow officers sleeping on duty.

---

[1]     Undesignated statutory references are to the Government Code.

FACTUAL AND PROCEDURAL BACKGROUND[2]

A. *Limon's Employment History*

CDCR hired Limon as a correctional officer in 2000. From approximately 2009 to 2014, Limon worked at the Richard J. Donovan Correctional Facility (Donovan).

In 2010, Limon reported that some Donovan officers were stealing inmates' cash cards. In retaliation, Limon's fellow officers shunned him and he was " 'fearful of being killed at any moment.' "

In August 2014, Limon transferred from Donovan to the State Transportation Unit (STU). Limon's duties included driving inmates in CDCR buses and vans.

B. *Limon Photographs and Reports Fellow Officers Sleeping on Duty*

There are ordinarily three officers on an STU bus: the driver, an officer in the front seat, and one in the back. On several occasions while driving, Limon saw the officer in the front seat asleep. Limon explained:

> "I would turn around and there would be this supervisor or the sergeant asleep, out cold, out cold, and this is while we're transporting dangerous inmates."

Limon reported the sleeping sergeants to Badilla, who told him to photograph the sleeping officers.[3] Between May and August 2015, Limon used his smartphone to photograph several STU officers asleep on duty in an

---

[2] The historical facts are stated in the light most favorable to the nonmoving party—here, Limon. (*Mackey v. Trustees of California State University* (2019) 31 Cal.App.5th 640, 647, fn. 3.)

[3] Badilla contends he told Limon to "refrain from taking photographs or using an electronic device while driving." However, on summary judgment, the facts are stated in the light most favorable to the appellant. See footnote 2, *ante*.

STU vehicle transporting prisoners. Before taking each photograph, Limon tried to awaken each of the officers but to no avail:

> "[Limon]: . . . I remember one of the other ones I even elbowed him, shoved him to wake him up. [¶] . . . [¶] I said, 'Hey, you know, you're snoring kind of. It's too—it's too much.' It kept happening. You know, I'd tell him, 'Wake up,' and yeah, wake up. Ten minutes later, out again, you know."

Limon photographed nine officers sleeping on duty while transporting prisoners. Limon told CDCR internal affairs investigators that he gave all of these photographs to Badilla either by text, e-mail, or hand delivery.

C. *Retaliation Against Limon*

Limon believed that his reports to Badilla were confidential, and Badilla acknowledged that Limon confided in him. However, soon after Limon's report to Badilla, fellow officers began retaliating:

> "[Limon]: . . . And the things that I would give to [Badilla], all of a sudden everybody knew about it, yet he was the only one I had given it to. How did they know about it?
>
> "Q: And what do you mean, an example . . . .
>
> "[Limon]: There was comments just being made. I was a rat. Comments being made about my photos."

Limon was shunned by fellow officers. A rat trap was placed on his bus seat and in his work mailbox. Limon's name was scratched off his STU mailbox. An unofficial " 'Hurt Feelings Report' " referring to Limon as a " 'whimp' " was placed in his STU mailbox. The document contained areas to complete the " 'Whiner's name, Date feelings were hurt and Name of the man or woman that hurt your sensitive feelings.' " When Limon showed that document to Lieutenant Pittman, the lieutenant laughed.

4

Limon's supervisors also retaliated. For two days, Limon was forced to work in uniform, but without a gun or a baton. Limon complained about the harassment and retaliation to CDCR but "nothing [came] of his complaints."

On July 27, 2015, CDCR transferred Limon back to Donovan. Limon went on medical leave that day and never returned to work.

D. *Limon's Television Interview*

In early May 2016, Limon filed a lawsuit against the CDCR, Badilla, Pittman, and others alleging whistleblower retaliation and related causes of action in a case entitled *Limon v. CDCR* et al. (Super. Ct. San Diego County, 2016, No. 37-2016-00015607-CU-OE-CTL, hereafter, *Limon I*). Limon's attorney attached to the complaint several photographs of sleeping officers.[4]

On May 17, 2016, a San Diego television station discovered Limon's lawsuit, and after contacting his attorney, the station interviewed Limon on its news program. On television, Limon stated he had been subjected to retaliation because he " 'did the right thing' " by reporting misconduct by fellow officers. The program displayed nine of Limon's photographs showing correctional officers asleep on duty.[5]

Associate Warden Joseph Williams has supervisory oversight of the STU unit. He described Limon as "the type of employee who was always

---

[4]    According to CDCR's attorneys, in April 2018 the trial court in *Limon I* granted defendants summary judgment, in part because Limon had failed to exhaust administrative remedies. The correctness of that judgment is not challenged here. Limon could not have alleged wrongful termination when he commenced *Limon I* because CDCR did not terminate his employment until more than a year later.

[5]    The television station "pixelated" the photographs to conceal the officers' identity.

5

early . . . polite, and willing to assist." Williams said the news program "was an embarrassment" to the Department and in particular to the STU.

E. *Internal Investigation of Limon*

Three days after Limon's television appearance, Badilla authored a memorandum stating that Limon had only brought three of the nine photographs to his and another supervisor's attention. As a result of Badilla's memorandum, in June 2016 an assistant deputy director asked CDCR's office of internal investigation to determine "whether [Limon] had failed to report the officers whose pictures were displayed during" the May 17, 2016 television interview.

Limon told the internal affairs investigator that he provided all of the photographs to Badilla, some even by hand delivery "to keep things confidential and safe."

Badilla contradicted Limon's account, stating that Limon had only given one of the photographs shown on television to him, plus two others not shown on television.

F. *CDCR Terminates Limon for Dishonesty*

In March 2017, internal affairs submitted its report to Warden Daniel Paramo. Paramo knew nothing of the investigation until the completed report was referred to him for disposition.

Paramo believed Badilla's statements that Limon had reported fewer than all of the officers whose photographs were shown on television. Accordingly, Paramo concluded that Limon provided "dishonest, evasive, and/or misleading information and responses to questions posed to him in that he claimed that prior to the termination of his assignment with the STU in 2015, [Limon] reported to Captain Badilla that he had observed [eight] Correctional Officers . . . sleeping on duty and had also provided Captain

6

Badilla with a copy of the photographs of these officers that were displayed during the broadcast of [Limon's] television interview."

Using an "Employee Disciplinary Matrix" contained in CDCR's operations manual, Paramo determined that the appropriate penalty for intentionally providing dishonest answers to an internal investigation is termination.

In August 2017, CDCR terminated Limon's employment on the grounds of (1) inexcusable neglect of duty; (2) dishonesty; (3) "[d]iscourteous treatment" of other employees; (4) willful disobedience; and (5) "[o]ther failure of good behavior" that "causes discredit to the appointing authority . . . ." In its "Notice of Adverse Action" (Notice), CDCR stated that Limon had knowingly violated CDCR policies and procedures by:

- Initiating news media contact without prior approval;
- Photographing officers without their prior consent;
- Using his cellphone to "surreptitiously take photographs" of sleeping officers;
- Failing to report to supervisors that STU staff were sleeping on duty;
- Dishonestly claiming to have reported to Badilla that nine officers were sleeping; and
- Inexcusably neglecting his duties by using a cellphone to photograph fellow STU workers sleeping on duty.

G. *Limon II and Motion for Summary Judgment*

In June 2018, Limon filed this action against CDCR alleging that his termination "was in direct retaliation for his reporting of health and safety violations . . . as well as his filing of a lawsuit against CDCR."

CDCR moved for summary judgment on the grounds that it terminated Limon's employment for "legitimate, non-retaliatory reasons"—specifically,

7

that Limon "gave false statements to the CDCR's Office of Internal Affairs during an investigatory interview." Limon's "false statements" occurred when he told investigators that he provided photographs to Badilla of the nine sleeping officers shown in the television news interview.

Opposing the motion, Limon conceded that dishonesty may warrant termination; however, he asserted that he was truthful and CDCR's conclusion that he lied is "drenched in retaliatory bias." Limon also asserted that even if Paramo held no personal retaliatory animus, there was "institutional animus against any correctional officer who had the audacity to 'rock the boat' by reporting rule violation[s] and then making them public through lawsuits or the media." As evidence of such motive, Limon pointed to the charge that he had photographed officers without their prior consent, which Limon characterized as "laughable." Limon's attorney asserted:

> "Presumably, [Limon] would have had to wake up each sleeping guard and get the guard's permission (in writing of course) to photograph him and then take the photograph after he went back to sleep to avoid this reason for his termination."

Limon also asserted there was a triable issue that CDCR's stated reasons for terminating his employment were pretextual, designed to cover up Badilla's own mismanagement:

> "Captain Badilla's [STU] was under immediate fire because he had allowed a lax operation wherein highly compensated state employees tasked with transporting dangerous criminals, routinely brought their pillows to work so they could sleep on the job.
>
> "Captain Badilla individually was exposed for having received numerous photographs and verbal reports of sleeping employees and then failed to follow up, a violation of CDCR policy. The truth is that if the [internal affairs] investigation tasked with investigating [Limon] had

8

concluded that [Limon] was telling the truth and Captain Badilla was lying, then Captain Badilla might very well be the one without the job. Captain Badilla had every incentive in the world to lie, whereas [Limon] did not."

## H. *The Court Grants Summary Judgment*

The court granted CDCR summary judgment, determining that CDCR "had legitimate non-retaliatory reasons for [Limon's] termination." The court ruled there was "no evidence" that CDCR terminated Limon "in retaliation for any whistleblowing acts" and no evidence "showing that the stated reason was untrue or pretextual."

## DISCUSSION

### THE COURT ERRONEOUSLY GRANTED SUMMARY JUDGMENT BECAUSE THERE IS A TRIABLE ISSUE OF RETALIATION

### A. *The Act*

The Act prohibits retaliation against state employees who "report waste, fraud, abuse of authority, violation of law, or threat to public health." (§ 8547.1.) A protected disclosure under the Act is " 'a good faith communication, including a communication based on, or when carrying out, job duties, that discloses or demonstrates an intention to disclose information that may evidence (1) an improper governmental activity, or (2) a condition that may significantly threaten the health or safety of employees or the public if the disclosure or intention to disclose was made for the purpose of remedying that condition.' " (*Levi v. Regents of University of California* (2017) 15 Cal.App.5th 892, 902.)

### B. *Summary Judgment Shifting Burdens in a Retaliation Case*

When an employer seeks summary judgment on a retaliation claim, the employer " 'has the initial burden to present admissible evidence showing either that one or more elements of plaintiff's prima facie case is lacking or

9

that the adverse employment action was based upon legitimate, [nonretaliatory] factors.' " (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 861.)

" 'If the employer meets its initial burden, the burden shifts to the employee to "demonstrate a triable issue by producing substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with a [retaliatory] *animus* . . . ." ' " (*Ortiz v. Dameron Hospital Assn.* (2019) 37 Cal.App.5th 568, 577-578.)

The central issue is whether the evidence as a whole supports a reasoned inference that the challenged action was the product of retaliatory animus. (*Light v. Department of Parks & Recreation* (2017) 14 Cal.App.5th 75, 94 (*Light*).) " '[T]he inference must be a reasonable conclusion from the evidence and cannot be based upon suspicion, imagination, speculation, surmise, conjecture or guesswork.' " (*McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 389.)

C.  *The Standard of Review*

Our review is de novo.  (*Hedayatzadeh v. City of Del Mar* (2020) 44 Cal.App.5th 555, 561.)  We view the evidence in the light most favorable to Limon as the losing party, and resolve any ambiguities in his favor.  (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142.)

D.  *There is a Triable Issue of Retaliation*

Limon does not dispute that dishonesty by a police officer is a "facially valid" reason for termination.  Accordingly, the correctness of the judgment turns on whether there is substantial evidence from which a jury could find either that the stated reason was pretextual or the circumstances " ' "as a whole support[] a reasoned inference that the challenged action was the product of . . . retaliatory animus." ' " (*Light*, *supra*, 14 Cal.App.5th at p. 94.)

10

"In responding to an employer's showing of a legitimate reason for the complained-of action, a plaintiff cannot show merely that the employer's decision was wrong, mistaken, or unwise. [Citation.] Rather, the employee must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence, and hence infer that the employer did not act for a nondiscriminatory reason." (*Hawkins v. City of Los Angeles* (2019) 40 Cal.App.5th 384, 395.)

There is sufficient evidence to create a triable issue that CDCR's proffered reason for firing Limon was pretextual. The important backdrop of the case, which would be relevant to the jury's evaluation of the proffered reason for dismissal, is what CDCR's Operations Manual calls the "code of silence"—an unwritten rule that an officer does not report wrongdoing by fellow officers, and an officer who does will be subjected to retaliation.[6]

Limon claimed he had already experienced such retaliation at Donovan. After reporting that fellow officers were stealing cash cards from inmates, he was shunned by other officers and " 'fearful of being killed at any moment.' " And again, soon after reporting that officers were sleeping on duty, Limon's fellow CDCR officers—including supervisors—retaliated by placing a rat trap on Limon's seat, crossing out his name on his work mailbox, drafting a " 'Hurt Feelings Report' " naming him as complainant (about which a lieutenant laughed in Limon's presence), and most significantly—forcing Limon to work for two days in uniform, but without a

---

[6] See *Parrish v. Solis* (N.D. Cal. 2014) 2014 U.S. Dist. Lexis 158914 at *29 [noting that the "CDCR's own documents described the 'Code of Silence' as a '*conspiracy* among staff to . . . retaliate against those employees who report wrongdoing' "].)

11

gun or baton to defend himself. Based on this evidence, Limon could reasonably argue that the message sent is that officers who report misconduct will be ostracized and made to fear for their own safety.

Despite this evidence, the superior court determined there was "no evidence of any 'institutional animus' " toward Limon. However, the evidence of retaliation summarized above supports a finding that CDCR officers and supervisors had a practice of retaliating against a whistleblower. The same evidence would also be sufficient to show that CDCR had failed to adequately train its officers not to retaliate against whistleblowers and/or that CDCR had failed to discipline those officers who retaliated against whistleblowers.

Moreover, in determining there was "no evidence of any 'animus,' " the superior court also overlooked that Badilla was already a named defendant in *Limon I* when Badilla drafted his memorandum that ultimately led to the internal investigation. That would give Badilla a motive to retaliate against Limon and exonerate himself from any responsibility for the officers' sleeping on duty. By claiming that Limon never gave him the photographs shown on television, Badilla could accomplish both of these objectives.

Further, Badilla "had the managerial responsibilities" for overseeing the STU. Limon publicly embarrassed Badilla on television and brought Badilla's own management failure into sharp focus by showing that sleeping in Badilla's unit was so accepted and institutionalized, some officers even brought pillows to work.

Further, the evidence is reasonably susceptible of an inference that within 72 hours of that public embarrassment, Badilla retaliated against Limon by writing a memorandum that accused Limon of lying—setting up Limon for being terminated for dishonesty. Badilla was not only a moving force for the internal investigation that lead to Limon's termination, but also

12

the chief witness against him. This evidence could support an inference of pretext or retaliation.

Additionally, there is substantial evidence that Badilla intentionally disclosed Limon's confidential communications to other officers, knowing and intending retaliation to result. Soon after Limon reported the sleeping guards to Badilla, STU officers retaliated against Limon, shunning him and calling him a "rat." As Limon explained to investigators, only he and Badilla knew about the photographs. If other officers knew too, it could be only because Badilla told them. In light of past acts of retaliation against Limon at Donovan, a jury could reasonably conclude that Badilla intentionally betrayed Limon's confidence, knowing and intending that retaliation result.

Defending the summary judgment, CDCR asserts that Paramo alone determined to fire Limon, and Paramo based his decision on the internal investigation report and objective criteria in the disciplinary matrix. CDCR insists, therefore, that Paramo could not have had any animus against Limon and decided to terminate Limon "independent of Captain Badilla . . . ."

However, Paramo had no personal knowledge of any relevant facts—he based his decision entirely on the contents of the internal affairs report. Paramo determined that Limon lied to investigators because Badilla "when interviewed, reported that Mr. Limon had only ever reported three officers . . . ." Far from being "independent" of Badilla, Paramo's decision to terminate Limon was substantially, if not entirely, based on Badilla's statements to internal affairs that portrayed Limon as a liar.

To defeat the summary judgment motion, it was not necessary that Limon demonstrate that Paramo himself had retaliatory animus. Rather, showing that Badilla—a significant participant in the termination—exhibited retaliatory animus is enough to raise an inference that the employment

13

decision itself was in retaliation for Limon's whistleblowing. The leading case for this approach is a decision authored by Judge Posner, *Shager v. Upjohn Co.* (7th Cir. 1990) 913 F.2d 398. The *Shager* plaintiff, a fifty-year-old salesperson, claimed that he was fired because his supervisor was hostile to older workers. The supervisor did not personally fire the plaintiff; rather, a committee, unbiased and unaware of the supervisor's prejudice, fired the plaintiff on the supervisor's recommendation. In analyzing whether the supervisor's motives could be imputed to the employer, the Court of Appeals looked to whether "the committee's decision to fire [the plaintiff] was tainted by [the supervisor's] prejudice." (*Id*. at p. 405). The record established that the supervisor "not only set up [the plaintiff] to fail by assigning him an unpromising [sales] territory but influenced the committee's deliberations by portraying [the plaintiff's] performance to the committee in the worst possible light." (*Ibid*.) Because the committee "acted as the conduit of [the supervisor's] prejudice," his prejudice could be imputed to the employer for liability purposes. (*Ibid*.) The *Shager* court colorfully stated that in effectuating the supervisor's wrongful intent, the committee had acted as the "cat's paw." (*Ibid*.)

California courts apply this same principle of imputed intent. After noting that all but one federal circuit had either adopted or approvingly referred to this doctrine, the appellate court in *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95 (*Reeves*) stated, "We have no doubt that California law will follow the overwhelming weight of federal authority and hold employers responsible where discriminatory or retaliatory actions by supervisory personnel bring about adverse employment actions through the instrumentality or conduit of other corporate actors who may be entirely innocent of discriminatory or retaliatory animus." (*Id*. at p. 116; see also

14

*DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 551 (*DeJung*) ["showing that a significant participant in an employment decision exhibited discriminatory animus is enough to raise an inference that the employment decision itself was discriminatory, even absent evidence that others in the process harbored such animus"].)[7]

CDCR does not contend the cat's paw doctrine is not a part of California law; rather, CDCR asserts the doctrine "has no applicability to this case" because "there was no evidence that Captain Badilla was motivated by retaliatory animus . . . ." However, as discussed *ante*, the evidence submitted on summary judgment creates a triable issue that Badilla was so motivated.

Moreover, the underlying facts in *Reeves*, *supra*, 121 Cal.App.4th 95 are indistinguishable from the operative facts here. Reeves was a grocery store employee who complained to his store manager that fellow workers were sexually harassing female employees. (*Id*. at p. 100.) The store manager "seemed resentful and sought to 'trivialize' the complaints." (*Ibid*.) A store manager sarcastically referred to Reeves as " 'Mr. Sexual Harassment.' " (*Id*. at p. 101.) Reeves was later accused of pushing a female coworker so he could reenter the store after business hours (his shift had just ended and he told the employee blocking his admittance that he urgently needed to use the bathroom). (*Id*. at pp. 101-102.) The store manager referred the pushing incident to store security for an investigation, knowing that all his prior referrals to security had resulted in terminations. (*Id*. at pp. 117-118.) Security conducted its investigation and recommended Reeves's termination to a district manager who was otherwise uninvolved in the incident or

_____

7    CDCR complains that Limon failed to raise the cat's paw theory in the superior court. However, although Limon did not use the phrase "cat's paw," he adequately raised the issue by arguing that even if Paramo held no personal retaliatory animus, there was actionable "institutional animus."

investigation.  (*Id*. at p. 104.)  The district manager terminated Reeves based on a conversation with the investigator.  (*Id*. at pp. 104-105.)  Reeves sued for retaliation, alleging he was terminated for complaining about sexual harassment of his female coworkers.  (*Id*. at p. 105.)  The trial court granted summary judgment for the employer, but the Court of Appeal reversed, explaining that although the district manager was unbiased, Reeves had presented sufficient evidence from which a jury could infer the store manager—who initiated and participated in the investigation—was motivated by retaliatory animus.  (*Id*. at pp. 108-109.)

Similarly here, although there is no evidence that Paramo himself had a retaliatory intent, Limon presented substantial evidence from which a jury could infer that Badilla, an employee in a supervisory capacity, was the driving force of the internal investigation, provided the chief evidence against Limon in that investigation, and did so to retaliate.

CDCR also contends that the cat's paw theory should not apply because Paramo "did not simply accept Captain Badilla's version of events."  Rather, Paramo also considered the absence of evidence that could corroborate Limon's version of events.  However, the issue on appeal from the summary judgment is not whether Paramo had a reasonable basis for believing Badilla and disbelieving Limon.  Rather, the pertinent question is whether there is substantial evidence that supervisory personnel steered the investigation to put Limon in the worst possible light.

Additionally, an inference that an employer's stated reason for an adverse employment decision is merely a pretext may arise where the employer has given implausible justifications for its action.  (*Reeves v. MV Transportation, Inc.* (2010) 186 Cal.App.4th 666, 677.)  Although CDCR maintains on appeal that it terminated Limon only for his dishonesty, the

16

Notice includes several other grounds including "[d]iscourteous treatment" of fellow officers and "[i]nexcusable neglect of duty."

The charge of "[d]iscourteous treatment" apparently stems from the fact that Limon photographed sleeping officers without their prior consent. This justification for terminating Limon borders on the absurd. A CDCR policy prohibiting photographing employees could not have been intended to prohibit documenting serious dereliction of duty.

The Notice also states that Limon "needlessly jeopardized the safety and security" of his fellow officers, inmate passengers, and public by taking photographs while operating a state vehicle and "senselessly subjected CDCR to potential liability for [his] actions." This purported ground for termination is also troubling. Limon took several of the photographs from a parked vehicle. The background in some of the photographs was sharp and clear, indicating a "still shot." And even with respect to the few photographs taken in a moving vehicle, CDCR does not and cannot explain how photographing prison guards sleeping aboard a bus transporting dangerous felons is a "senseless[]" act warranting the whistleblower's termination.

In sum, viewing the evidence in the light most favorable to Limon, there is a triable issue of material fact as to whether CDCR's stated reason for Limon's termination is pretextual or the product of retaliatory animus.

DISPOSITION

The judgment is reversed.  Limon is entitled to costs on appeal.


GUERRERO, J.

WE CONCUR:


HALLER, Acting P. J.


AARON, J.