Filed 4/23/26  Golshani v. Bd. of Trustees of the Cal. State U. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| FOROUZAN GOLSHANI, | B337469 |
| Plaintiff and Appellant, | Los Angeles County Super. Ct. No. 20STCV40168 |
| v. | |
| BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Douglas W. Stern, Judge.  Reversed.

Gusdorff Law, Janet Gusdorff; Hennig Kramer, Kramer Brown Hui, Robert A. Hennig, Jennifer R. Kramer, Dat Tommy Phan, Sam M. Brown; The Law Office of Nicole Meyers, Principle Employment Law, Nicole Meyers; Public Employees Legal and Oshea V. Orchid for Plaintiff and Appellant.

Complex Appellate Litigation Group, Jens B. Koepke, Greg Wolff; Burke, Williams & Sorensen, Daphne Anneet and Vanessa M. Hooker for Defendant and Respondent.

---

Plaintiff Forouzan Golshani appeals a summary judgment in favor of the Board of Trustees of the California State University (the Board) on his claim for unlawful retaliation under the California Whistleblower Protection Act (CWPA or Act, Gov. Code, § 8547 et seq.).[1]  Construing the evidence in the light most favorable to Golshani as the party opposing summary judgment, we conclude there are triable issues of material fact as to whether Golshani made protected disclosures about threats to employee health and safety under the CWPA, whether those disclosures were a contributing factor in a sequence of adverse employment actions that followed, and whether the same adverse actions would have been taken absent the protected disclosures. We reverse the summary judgment.

## BACKGROUND

Consistent with our standard of review, we state the facts in the light most favorable to Golshani as the nonmoving party, liberally construing the evidence in his favor, except that to which objections were made and sustained.  (*Lonicki v. Sutter Health Central* (2008) 43 Cal.4th 201, 206; *Vatalaro v. County of Sacramento* (2022) 79 Cal.App.5th 367, 377 (*Vatalaro*).)  We note the trial court sustained the Board's objections to significant parts of Golshani's summary judgment declaration, based largely on conflicts between the declaration and Golshani's earlier

---

[1]     Statutory references are to the Government Code, unless otherwise specified.

2

deposition testimony. We therefore disregard statements in Golshani's declaration to which objections were sustained and draw the relevant facts from his deposition. We likewise disregard statements in the Board's supporting declarations to which Golshani's evidentiary objections were sustained. (See *Archdale v. American Internat. Specialty Lines Ins. Co.* (2007) 154 Cal.App.4th 449, 473 ["Where a party's self-serving declarations contradict credible discovery admissions and purport to impeach that party's own prior sworn testimony, they should be disregarded."]; accord *Vatalaro,* at p. 381.)

1. ***Safety in the College of Engineering***

Dr. Golshani was the Dean of the College of Engineering at California State University, Long Beach (CSULB or the University) from August 2007 until his non-retention in January 2020. During his tenure, Golshani received excellent performance reviews and was recognized for his success in recruiting higher quality faculty and growing student enrollment.

Dr. Brian Jersky was the Provost at CSULB and Golshani's direct supervisor from July 2016 to January 2020. As Provost, Jersky had hiring authority for management employees, including the deans of the University's various colleges. Golshani met with Jersky on a monthly basis and during Council of Deans meetings. He always tried to maintain a professional, cordial, and supportive relationship with the Provost.

Under the University's governing Injury and Illness Prevention Program (IIPP), Dean Golshani was responsible for ensuring the safety of the College's classrooms, laboratories, and workplaces. This included (among other things) establishing "clearly outlined safety responsibilities" for employees under his supervision; developing and implementing "a specific training

3

program designed to instruct employees in general safe work practices"; performing "all necessary corrective actions as identified by safety inspections"; and conducting "preliminary investigations of all reported industrial injuries and illnesses."

From the beginning of Jersky's tenure (and before then), Golshani was always outspoken about safety issues with the Provost. This included ongoing requests for funding, support, and personnel to address safety issues in the College of Engineering. The College's lack of a full-time safety officer was a special concern. Golshani had repeatedly raised the issue with the serving Provost since 2007, including with Jersky after he became Provost in 2016. Despite ongoing discussions about the need to hire a safety officer, Golshani had always been denied the necessary funding to fill this critical position.[2] He alerted Jersky about other safety hazards at the College as well, including the need for funding for asbestos removal and the installation of fume hoods, non-skid flooring, and biosafety cabinets in certain labs.

Upon becoming Dean in 2007, Golshani had appointed Dr. Hamid Kavianian as a part-time safety coordinator for the College by reallocating a quarter of Kavianian's teaching time so he could serve in the position. Kavianian developed safety policies and procedures, forms, trainings, and questionnaires to ensure that those who entered and worked in the College's labs

---

[2] As Jersky explained in his deposition, neither he nor Golshani could hire a permanent full-time safety officer without a permanent funding source. For new positions that did not have ongoing funding, Jersky testified he would be required to request the funds from the University President, who would have "full discretion" to grant or deny the money.

had appropriate knowledge about safety protocols. Until 2012 when Kavianian retired, he was responsible for tackling a host of safety matters, including junk in labs and offices, cabinets with unmarked chemicals, eroded containers, and other hazards that the College had neglected for decades. This was an ongoing process due to a lack of resources and funding—an issue that Golshani frequently raised with the serving Provost in connection with his efforts to call attention to safety concerns at the College.

Golshani supervised Dr. Hamid Rahai, who served as Associate Dean during Golshani's tenure. Golshani expected his associate deans to be watchful of safety matters in the College of Engineering. Although he made clear to College personnel that safety was everyone's responsibility, Golshani recognized his associate deans generally worked more closely with the labs and thus could provide better oversight of safety concerns. Rahai had a good working relationship with Golshani and understood that he was expected to work closely with the College's safety personnel.

In 2014, a hiring committee recommended Michael Hom to serve as safety officer for the College. As before, budgetary constraints meant that Golshani would need to reallocate Hom's teaching responsibilities to allow him to serve in the position. Golshani did this by increasing the time assigned for the safety officer position from 25 percent to 50 percent of Hom's time.

Hom reported to Associate Dean Rahai. The two worked together on several safety initiatives, including safety drives, establishing safety quizzes, and conducting routine inspections. Hom was in charge of and conducted safety trainings with faculty and students. He also conducted annual inventories and ensured the College used locked cabinets to store chemicals

safely. He regularly emailed faculty regarding the proper handling of chemicals stored in offices and labs. Rahai never reported any issues with Hom's performance to Golshani.

As safety officer, Hom also served as a liaison between the College of Engineering and CSULB's Environmental Health and Safety Office (EHS). EHS is a campus-wide office within the University's facilities department—known as Beach Building Services (BBS)—that is responsible for implementing and managing the IIPP. BBS is headed by Scott Apel. Tony Malagrino—an Associate Vice President in BBS—manages EHS.

In 2015, EHS audited the College of Engineering and found multiple safety violations. It shared the audit report and corrective recommendations with the College's facilities coordinator; however, a number of the issues were beyond the coordinator's power to fix. Despite this, EHS did not share the audit report with Hom or Golshani.

In 2016, EHS performed follow-up safety audits and, with few exceptions, found that issues reported in the 2015 audit had not been corrected. In an email to the EHS director and Malagrino summarizing the 2016 inspections, the inspector noted that conditions "have reached a potential hazard threshold such that the labs/rooms should be closed until corrective actions are completed." The inspector recommended that notices of violation be sent to the College's Dean (Golshani) and that a qualified, full-time safety officer be appointed immediately. Despite these recommendations, Golshani's ongoing requests for funding to hire a full-time safety officer remained unmet.[3]

---

[3]     According to the inspector, EHS requested a meeting with Golshani to review the issues identified in the audit and to develop an action plan to resolve the deficiencies. Golshani

Notwithstanding the results of the EHS audits in 2015 and 2016, Golshani received positive performance evaluations for those academic years, including an evaluation of "exceeds expectations" from Jersky for 2016.

## 2. *The 2018 Chemical Fire*

On February 27, 2018, the College of Engineering had a major safety incident when a chemical explosion ignited a fire in one of the labs. An arson investigation by the Long Beach Police Department (LBPD) determined Dr. Ted Yu (an Assistant Professor of Chemical Engineering) had likely caused the explosion while attempting to dissolve lithium waste in a bucket of water. Over 50 fire department personnel and 25 vehicles were required to put out the fire. Yu was hospitalized, and the fire caused more than a million dollars of damage that took over a year to repair. The City of Long Beach cited the University for several safety violations in connection with the incident.

A week after the fire, on March 5, 2018, Golshani reported to Jersky, Apel, and the President of CSULB that he had started an audit of the College's "safety procedures, procurement processes, and faculty and students' level of compliance with the guidelines," as authorized and directed under the IIPP.[4] He explained the College had "sought the assistance of an

_____

sent Rahai to attend the meeting in his place. The parties have not directed us to any evidence in the record regarding what Rahai communicated to Golshani about the meeting.

[4] As noted, the IIPP directs that the dean of each college is responsible for conducting "preliminary investigations of all reported industrial injuries and illnesses" affecting facilities under his or her purview.

7

independent expert to conduct the audit" and he committed the College to "implement[ing] meticulously every recommendation that the various investigating teams will present to us." The President thanked Golshani for the update and agreed an investigation should help everyone "learn something important that will increase safety from this point on." Apel forwarded Golshani's email to Malagrino. In a cryptic response, Malagrino appeared to question the wisdom of consulting an independent party, writing, "Independent expert?"

Two days later, Jersky emailed Golshani about the plan to bring "in an independent consultant to investigate the chemical incident." Jersky asked Golshani to "provide me details of this in writing," concluding his email with the admonition, "Just so you know, I advise you not to do this." Golshani responded, explaining that he had asked Kavianian to return from retirement "to assist us in examining our published safety procedures and identify any gaps in what we have in place." He explained that the "goal is to create a culture of safety in the entire college," and reminded Jersky that Kavianian was "a national expert in health and safety" and that he had been the College's safety coordinator for many years.[5] Golshani advised Jersky that his staff had met with Kavianian that morning and that Kavianian had "pointed out several important updates to our processes." Nevertheless, in apparent response to Jersky's admonition, Golshani asked Jersky to "let me know

---

[5] In his deposition, Golshani elaborated on the intended audit, explaining that he "was interested to know if there were things that needed to be updated" and he "wanted to have a checkpoint and document that indeed . . . the safety procedures that we had were indeed enforced."

if we should stop this 'self audit.'" Jersky responded, "I think it is better if you do not proceed with this at this stage." Golshani wrote back, confirming he would "stop this immediately."

Ultimately, EHS conducted its own investigation of the incident. While it consulted frequently with Jersky, Golshani was excluded from the process. In a report memorializing its findings, EHS determined the "root causes" of the incident were (1) lack of training, as Yu was not trained on critical hazardous waste disposal procedures; and (2) lack of an adequate hazardous material purchasing procedure, as many of the hazardous chemicals in the lab were not on the room's chemical inventory list. The report cited inadequate leadership and supervision as contributing factors, explaining the College of Engineering had failed to ensure that Yu follow the requisite hazardous waste disposal protocols or that he wear all required personal protective equipment. Jersky received a copy of the report from EHS but did not share it with Golshani, despite Golshani's requests to review all safety audits related to the fire in his meetings with the Provost.

Although Golshani had growing concerns that Jersky and EHS were excluding him from the investigation and decision-making processes related to the fire, he continued to impress upon Jersky the need to hire two full-time safety officers for the College of Engineering. Jersky initially assured Golshani that funds would be allocated to hire two safety officers, but the Provost later reduced this to a single line of funds for only one new hire.

After consulting with EHS, Jersky assigned a faculty member from outside the College of Engineering to head a hiring committee for the new full-time safety officer. Although it was

routine and customary for the Dean to be involved in this process, Golshani was not given information on candidate qualifications or permitted to interview any of the candidates. Instead, the head of the hiring committee regularly reported to Jersky on the progress of the search, and Jersky relayed those updates to EHS.

In January 2019, the committee hired Ricardo Magallanes as the Chemical Hygiene Officer for the College. Golshani was advised that Magallanes was not the committee's top choice, but Golshani was still asked to sign the hiring paperwork. Given the urgency of bringing a safety officer onboard, Golshani promptly did so. He then raised his concerns with Jersky, outlining the negative impacts of the irregular procedures, which he warned might have direct consequences for the safety of students and staff.

3.      *The 2019 CSU Safety Audit*

In 2019, the Division of Audit and Advisory Services at the CSU's Chancellor's Office conducted an internal audit of health and safety at CSULB. As memorialized in a July 2019 report, the audit concluded the University's administrative controls regarding safety were inadequate, with the College of Engineering accounting for many of the violations.

After learning of the audit's findings, Golshani told Jersky the College would take immediate corrective measures to address the safety issues. While an October 2019 report by EHS found that little progress had been made, Magallanes testified that the College managed to remedy all the issues raised in the safety audit after he came on board.

**4.** *Golshani Recommends Yu for Tenure*

In early 2019, Yu came up for tenure and promotion review. Golshani recommended him for tenure, as did Yu's department and the College of Engineering tenure committee.

Jersky objected to Golshani's recommendation, given that Yu's mishandling of chemicals had caused the 2018 fire. After reviewing Yu's application materials, Jersky discovered that Yu had not included a copy of the LBPD arson investigation report in his self-selected tenure review file, although his official personnel file did contain a copy of the report. Jersky was surprised to learn that Golshani had not reviewed Yu's official personnel file in making his tenure recommendation. Golshani explained that he believed University policy prohibited him from reviewing the official personnel file and he had therefore reviewed only Yu's application materials. This response alarmed Jersky, as he believed the collective bargaining agreement that governed the tenure review process mandated that tenure decisions be based on the official personnel file.

Contrary to Jersky's stated understanding, Mark Wiley— a former Associate Vice President in the Office of Faculty Affairs whom the Board designated as its person most qualified regarding tenure decisions—testified that faculty members, including college deans, typically do not look at an applicant's personnel file and, in fact, are trained to confine their evaluation to the applicant's self-selected tenure review file. As Wiley explained, the official personnel file is a "security file" that can only be accessed "at the provost level" or with permission from the Office of Faculty Affairs.

Jersky ultimately denied Yu's tenure application.

**5.** *Chemical Hygiene Officer Magallanes Resigns*

In November 2019, Magallanes resigned his position as the College's chief safety officer. In an exit interview, he reported that the College of Engineering had a culture of ignoring safety protocols; that Rahai had advised him of a directive by Golshani to stop electronically documenting safety violations and to record them instead in a handwritten journal; and that, in his view, Golshani showed favoritism to certain faculty members who were not held to account for safety violations in their respective classrooms and laboratories. Rahai refuted these claims and maintained that the College administration, including Golshani, made every effort to comply with safety protocols and were firmly committed to safety. Apel notified Jersky that Magallanes's claims would need to be investigated; however, neither Jersky nor anyone in EHS discussed the allegations with Golshani or Rahai at the time.

Although Jersky had given Golshani relatively high marks in his 2017 and 2018 performance reviews, his 2019 review contained critical comments about Golshani's oversight of safety conditions at the College and his handling of the Yu tenure review process.

**6.** *Jersky Decides Not to Retain Golshani as Dean*

In January 2020, Jersky informed Golshani of the decision not to retain him as Dean of the College of Engineering. Golshani sought reconsideration and met with Jersky as part of that process. During the meeting, Jersky identified three reasons for the non-retention decision: (1) ongoing safety concerns at the College; (2) Golshani's recommendation of Yu for a tenured faculty position; and (3) Golshani's lack of understanding of academic hierarchy. The University denied reconsideration.

**7.** ***Golshani Files an Administrative Complaint***
***with the University***

After his non-retention, Golshani exercised his retreat rights and became a tenured professor in the Computer Engineering and Computer Science Department.

On October 1, 2020, Golshani filed an administrative complaint with the University claiming Jersky had retaliated against him by removing him as Dean in response to his complaints about safety concerns and requests for funding and personnel to remedy those concerns. As Golshani later explained in his deposition, he filed the complaint because he had been "shut out" from all matters related to safety after the 2018 fire and "used as a scapegoat" for Apel's and Jersky's failures after "all of [his] requests regarding safety had been ignored up until the time of the accident." In accordance with CSULB policy, the University hired an outside law firm to investigate the claim.

As set forth in the investigator's report, Golshani explained that "safety was a concern at the [College] 'since day one,'" and he had "made 'many' requests for funding" over the years "to upgrade the College's safety programs and facilities but was never granted the requested funds." Golshani also reported that, following the 2018 fire, "he began a self-audit of the [College] to determine if its safety policies and procedures were sufficient in light of the accident, but Mr. Jersky advised him to cease the audit." Golshani alleged that Jersky "instructed him to stop the self-audit because Mr. Jersky could find himself in trouble for the accident and wanted to 'cover his tracks and position himself as the savior.'"

13

The investigator found Golshani had made a protected disclosure that "potentially involved safety conditions . . . that could threaten the health and safety of employees, students and/or the public." However, based on his "review of all relevant evidence," he found "it is more likely than not that Dr. Golshani's complaints about safety were not a contributing factor in the decision to remove [him] as the Dean." The investigator explained: "Mr. Jersky cited as one of his concerns Dr. Golshani's failure to appreciate how his department has failed to properly train staff on safety-related concerns. It strains credibility that he would therefore remove Dr. Golshani from his dean position for sharing his exact concerns regarding safety."

**8.**    ***Golshani Sues the University***

On October 20, 2020, Golshani filed his original complaint against the Board. The operative third amended complaint asserts a single cause of action for whistleblower retaliation under section 8547.12. The pleading alleges Golshani made three specific protected disclosures "regarding conditions that significantly threaten the health or safety of employees or the public": (1) "informing his supervisors that he was conducting a self-audit to ensure that the College was up to date in policies and procedures relating to modern safety hazard[s] after a chemical reaction resulted in a fire in the College's lab"; (2) "informing his supervisors about safety issues identified by the CSU safety audit that [were] either addressed by the College's technician or [for] which purchase order[s] need[ed] to be submitted to contract services"; and (3) "making requests to his supervisor(s) for funding, support, and personnel to address safety issues in the College."

14

### 9. *The Board Moves for Summary Judgment*

The Board moved for summary judgment, arguing the undisputed evidence established Golshani could not prove either that his three alleged disclosures were "protected" under the whistleblower statute or that any of the alleged disclosures was a contributing factor in the decision not to retain him as Dean. The Board also argued it had a complete defense in that clear and convincing evidence proved beyond dispute that Golshani would have been dismissed from his position as Dean for legitimate non-retaliatory reasons, regardless of whether he engaged in protected conduct.

In support of the motion, the Board relied heavily upon Golshani's deposition, including testimony that (a) Golshani consistently disclosed to his supervisors that the College did not have "proper safety support and resources" even before Jersky was appointed as Provost; (b) Golshani "was always outspoken about safety issues" with Jersky throughout Jersky's tenure as Provost; and (c) Golshani requested funding from Jersky every year for "safety issues," including requests for funds to hire a full-time safety officer. The Board argued Golshani's testimony conclusively proved that his alleged disclosures were not a contributing factor in any adverse employment action because (a) Golshani had always received positive performance reviews (including from Jersky) notwithstanding his consistent outspokenness about safety and requests for funding, and (b) his negative performance review and subsequent non-retention came only after the 2018 chemical explosion and his recommendation of Yu for tenure.

In his opposition, Golshani asserted for the first time that he had made five (not three) protected disclosures—only

15

two of which appeared to align with those alleged in the third amended complaint: (1) reporting his intention to conduct a safety investigation into the chemical fire; (2) reporting the need to hire two full-time safety officers after the recent chemical fire; (3) complaining of inflated service prices as improper government activity and prohibited government waste; (4) complaining that Jersky violated CSULB's policies and regulations for retention, tenure, and promotion in connection with Yu's tenure review; and (5) complaining of unlawful retaliation for engaging in protected disclosures. He argued the evidence, when viewed in the light most favorable to him as the non-moving party, created disputes of material fact on every issue raised in the Board's summary judgment motion.

**10.** ***The Trial Court Grants Summary Judgment and Denies Leave to Amend***

The day before the scheduled hearing, the trial court issued a tentative ruling granting the summary judgment motion. The tentative indicated that the court would not consider the purported disclosures that had not been alleged in Golshani's operative pleading.

The morning of the hearing, Golshani filed a motion to amend his third amended complaint to add allegations for the additional disclosures that were not included in the operative pleading. At the start of the hearing, he also moved orally for leave to amend and asked the court to continue the summary judgment hearing until his written motion could be heard. The court denied the oral motion and request to continue.

Addressing the disclosures alleged in Golshani's complaint, the trial court concluded that "[n]one of [Golshani's] alleged disclosures would be protected disclosures." And, even if

16

Golshani's alleged disclosures were protected, the court determined Golshani had failed to raise a triable issue of fact as to whether the disclosures were a contributing factor in his non-retention.  Finally, the court found that clear and convincing evidence showed that CSULB would have non-retained, and did non-retain, Golshani for legitimate reasons, independent of the alleged disclosures.  Thus, the court granted summary judgment on all elements of Golshani's whistleblower claim.

Three weeks later, the court heard Golshani's motion for leave to amend.  The court denied the motion, concluding that Golshani had unreasonably delayed in seeking leave to amend and that granting leave would prejudice the Board by requiring it to file another motion for summary judgment.

The court entered judgment for the Board.  This timely appeal followed.

## DISCUSSION

### 1.   *Standard of Review*

A trial court may grant a motion for summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  (Code Civ. Proc., § 437c, subd. (c).)

To meet its burden on summary judgment, a moving defendant must show either that one or more elements of the plaintiff's causes of action fail or that there is a complete defense to the plaintiff's case.  (Code Civ. Proc., § 437c, subd. (p)(2).)  If the defendant meets this initial burden, the burden then shifts to the plaintiff to show that a triable issue of one or more material facts exists.  (*Ibid.*)  A triable issue of a material fact exists "if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing

17

the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 845.)

We review an order granting summary judgment de novo, " 'liberally constru[ing] the evidence in support of the party opposing summary judgment and resolv[ing] doubts concerning the evidence in favor of that party.' " (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 286; *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037 (*Yanowitz*); *Vatalaro, supra,* 79 Cal.App.5th at p. 377; *Scheer v. Regents of University of California* (2022) 76 Cal.App.5th 904, 913 (*Scheer*).)

## 2.     *The California Whistleblower Protection Act*

The CWPA prohibits retaliation against state employees who "report waste, fraud, abuse of authority, violation of law, or threat[s] to public health." (§ 8547.1; *Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 882 (*Miklosy*).) The Act is premised on the legislative finding that "public servants best serve the citizenry when they can be candid and honest without reservation in conducting the people's business." (§ 8547.1.) Thus, the CWPA aims to " 'protect[ ] the right of state employees' " to report matters of public concern " ' "without fear of retribution." ' " (*Runyon v. Board of Trustees of California State University* (2010) 48 Cal.4th 760, 774 (*Runyon*).)

Section 8547.12 authorizes an employee of the CSU system to bring a civil action for damages to redress acts of retaliation. (See *Runyon, supra,* 48 Cal.4th at pp. 767, 769, 774.) Under the statute, a CSU employee establishes a whistleblower retaliation claim by proving (1) that he or she engaged in a "protected" activity or made a "protected disclosure[ ]" under the Act; and (2) that the protected activity was a "contributing factor" in the

18

alleged retaliation against the employee. (§ 8547.12, subd. (e).)[6] If the employee makes this showing, "the burden of proof" then shifts to the employer "to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in protected disclosures." (*Ibid.*)

Because the burden rests with the employer to establish its affirmative defense, the employee need not prove that the employer's asserted legitimate reason was pretextual to establish a CWPA claim. (See *Scheer, supra,* 76 Cal.App.5th at pp. 912–913, 915–916, citing *Lawson v. PPG Architectural Finishes, Inc.* (2022) 12 Cal.5th 703 (*Lawson*).) Rather, "plaintiffs may satisfy their burden of proving unlawful retaliation even when other, legitimate factors also contributed to the adverse action," simply by showing that "the employer also had at least one retaliatory reason that was a *contributing factor* in the action." (*Lawson*, at pp. 713–714, 716, italics added; *Scheer,* at pp. 915–916.)[7]

---

[6] Section 8547.12, subdivision (e) provides in relevant part: "In any civil action or administrative proceeding, once it has been demonstrated by a preponderance of the evidence that an activity protected by this article was a contributing factor in the alleged retaliation against a former, current, or prospective employee, the burden of proof shall be on the supervisor, manager, or appointing power to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in protected disclosures or refused an illegal order."

[7] As our high court explained in *Lawson*, this distinguishes whistleblower actions from traditional employment discrimination cases where our courts generally apply the three-part *McDonnell Douglas* burden-shifting framework for trying

19

**3.** *Golshani Produced Sufficient Evidence to Demonstrate He Made a Protected Disclosure*

The CWPA defines a " 'Protected disclosure' " as "a good faith communication, including a communication based on, or when carrying out, job duties, that discloses or demonstrates an intention to disclose information that may evidence either of the following circumstances: [¶] (A) An improper governmental activity. [¶] (B) A condition that may significantly threaten the health or safety of employees or the public if the disclosure or intention to disclose was made for the purpose of remedying that condition." (§ 8547.2, subd. (e)(1).) In the context of a whistleblower statute like the CWPA, the term " 'disclosure' "

_____

claims of intentional discrimination based on circumstantial evidence. (*Lawson, supra,* 12 Cal.5th at pp. 707–710; see *McDonnell Douglas Corporation v. Green* (1973) 411 U.S. 792.) Under that framework, "the employee must establish a prima facie case of unlawful discrimination or retaliation"; then "the employer bears the burden of articulating a legitimate reason for taking the challenged adverse employment action"; and, finally, "the burden shifts back to the employee to demonstrate that the employer's proffered legitimate reason is a pretext for discrimination or retaliation." (*Lawson,* at p. 708; *McDonnell Douglas,* at pp. 802–804.) In contrast, for claims brought under whistleblower statutes like section 8547.12, "a plaintiff does not need to show that the employer's nonretaliatory reason was pretextual" because the statutory text requires only a showing that the employee's protected activity was a "contributing factor." (*Lawson,* at pp. 715–716 [determining applicable framework for assessing plaintiff's burden to prove whistleblower claim under Labor Code section 1102.6]; see *Scheer, supra,* 76 Cal.App.5th at pp. 915–916 [applying *Lawson* to CWPA claim].)

20

encompasses a communication that "calls attention to" one of the enumerated circumstances of public concern, even if the "recipient of such information has prior knowledge" of it. (*People ex rel. Garcia-Brower v. Kolla's, Inc.* (2023) 14 Cal.5th 719, 726 (*Kolla's*) [interpreting the term "disclosure" in Labor Code whistleblower statute]; see *Scheer, supra,* 76 Cal.App.5th at pp. 915–916 [recognizing our Supreme Court's interpretation of Labor Code is relevant and generally applicable to construction of identical terms in CWPA].)

In his operative complaint, Golshani alleged he made three protected disclosures, two of which he advanced in opposition to summary judgment: (1) "informing his supervisors that he was conducting a self-audit to ensure that the College was up to date in policies and procedures relating to modern safety hazard[s] after a chemical reaction resulted in a fire in the College's lab"; and (2) "making requests to his supervisor(s) for funding, support, and personnel to address safety issues in the College."[8]

---

[8] Because we conclude the trial court correctly disregarded the additional disclosures that Golshani asserted for the first time in his opposition, we do not address those disclosures here. (See *Hutton v. Fidelity National Title Co.* (2013) 213 Cal.App.4th 486, 493 ["[T]he burden of a defendant moving for summary judgment only requires that he or she negate plaintiff's theories of liability *as alleged in the complaint*; that is, a moving party need not refute liability on some theoretical possibility not included in the pleadings."]; *Melican v. Regents of University of California* (2007) 151 Cal.App.4th 168, 182 ["We do not require [defendant] to negate elements of causes of action plaintiffs never pleaded."].)

Nor do we address Golshani's alleged disclosure "informing his supervisors about safety issues identified by the CSU safety audit that [were] either addressed by the College's technician or

In its motion for summary judgment, the Board argued neither of these alleged disclosures met the statutory definition of a "protected disclosure" because (a) Golshani's "reason for doing a 'self-audit' was not to sound the alarm on any particular dangerous condition but simply to find out what, *if any*, changes or updates to his policies might be recommended"; and (b) his requests for funding were made "in the context of routine, internal administrative functions and not for purposes of 'blowing the whistle' on any workplace hazard." The trial court agreed with the Board on these points, concluding Golshani had not made a protected disclosure because (a) in announcing the self-audit, Golshani "was not disclosing or demonstrating any condition that could threaten health or safety" but, instead, "merely declaring his intention to look into the safety practices of his department"; and (b) in requesting funding, Golshani "was not disclosing anything" but, instead, "simply asking for

---

[for] which purchase order[s] need[ed] to be submitted to contract services." The Board challenged this allegation in its summary judgment motion, presenting evidence to show that it did not constitute a protected disclosure because the alleged statements were not made for the purpose of remedying "any threatening safety condition," but merely to report that "safety issues were being addressed." This was sufficient to satisfy the Board's moving burden. Because Golshani did not confront this evidence in his opposition, let alone present his own evidence to create a triable issue of fact, he effectively forfeited the issue for appeal. (See *California Restaurant Management Systems v. City of San Diego* (2011) 195 Cal.App.4th 1581, 1593, fn. 7 ["When an argument is not asserted below in opposition to a motion for summary judgment, it is deemed waived and will not be considered for the first time on appeal to reverse an order granting summary judgment."].)

resources to address safety concerns, which is an administrative concern." There are a number of problems with this reasoning.

First, the Board's arguments and the court's conclusions overlook crucial context established by the summary judgment evidence. Viewed in the light most favorable to Golshani, the evidence showed that from the beginning of Jersky's tenure in 2016, Golshani was "always outspoken about safety issues" with the Provost, and he repeatedly called attention to the need for funds to hire a full-time safety officer who could address these ongoing safety concerns.[9] Even after reallocating some of Kavianian's, and later Hom's, teaching responsibilities to a part-time safety officer assignment, Golshani continued to report to Jersky that there were unresolved safety hazards and to stress the need to hire someone full-time who could finally address these issues. Then, in February 2018, the College experienced

---

[9] Although the Board itself advanced as an undisputed fact that Golshani " 'was always outspoken about safety issues' to Dr. Jersky," in its motion for summary judgment and on appeal, it also relied on evidence purporting to show Golshani "consistently sought to assure and re-assure his superiors that there were *not any* significant safety or health conditions in the College under his watch." While possible inconsistencies in Golshani's prior testimony may prove relevant to a trier of fact charged with assessing his credibility, on summary judgment, we—like the trial court—are compelled to view the evidence in the light most favorable to Golshani and to resolve all doubts and credibility determinations in his favor. (*Yanowitz, supra,* 36 Cal.4th at p. 1037; see also *Consumer Cause, Inc. v. SmileCare* (2001) 91 Cal.App.4th 454, 473 [" 'A summary judgment should not be based on tacit admissions or fragmentary and equivocal concessions, which are contradicted by other credible evidence.' "].)

a major safety incident when a chemical explosion set fire to one of the labs.  As Golshani aptly puts it, he "did not simply conjure a need to do a safety audit out of thin air."  Rather, he had persistently raised safety concerns in making his requests for additional resources to address what—we may reasonably infer—he had disclosed were significant threats to "the health or safety of employees or the public" in his meetings with the Provost.  (§ 8547.2, subd. (e)(1)(B).)

Second, as Golshani also correctly observes, the statutory definition of "protected disclosure" encompasses "a good faith communication" that *either* "discloses *or demonstrates an intention to disclose* information" about a condition that may significantly threaten "health or safety."  (§ 8547.2, subd. (e)(1)(B), italics added.)[10]  After the fire, Golshani emailed Jersky, Apel, and the President of CSULB to report that he had started an audit of the College's "safety procedures, procurement processes, and faculty and students' level of compliance with [safety] guidelines," with the intention of implementing

---

[10]     The Board claims Golshani "never" made the argument in his summary judgment opposition that his alleged disclosures included a communication demonstrating "an intention to disclose health and safety information (as opposed to an actual disclosure of information)."  This is incorrect.  Our review of the record confirms Golshani opposed summary judgment on this very point, emphasizing in his brief to the trial court that section 8547.12 "specifically protects CSU employees from retaliation for good faith communication disclosing or even for a **demonstrated intent to disclose evidence of a condition** that could significantly threaten the health or safety of employees or the public," and arguing, "[t]his is exactly what Plaintiff did repeatedly."

24

"every recommendation that the various investigating teams will present to us." A reasonable inference that we must draw from this evidence is that Golshani called attention to this safety audit because (a) there were unaddressed safety hazards, as he had reported in meetings with Jersky and as the chemical explosion seemingly confirmed; and (b) he intended to disclose information about those hazards in implementing the recommendations he anticipated the investigation would produce. Notably, this appears to be exactly how CSULB's President understood the disclosure. Thus, in her reply to Golshani, she thanked the Dean for the information and agreed that an investigation was likely to uncover "something important that will increase safety from this point on."[11] Viewing the evidence in the light most favorable to Golshani, we are compelled to draw the same inference—that in disclosing he had begun an audit of the College's compliance with safety procedures, Golshani communicated his "intention to disclose information" about a condition that could significantly threaten "health or safety" going forward. (§ 8547.2, subd. (e)(1)(B).)

Third, the trial court's application of an exception for purported "administrative concern[s]" is inconsistent with the CWPA's statutory text and its legislative purpose. As discussed,

---

[11] It also is notable that, while Jersky's stated misgivings about Golshani's investigation effectively put an end to it, the investigation conducted by EHS without Golshani's involvement nevertheless reached a conclusion largely in line with the principal safety issue that Golshani had raised—namely, that faculty's failure to follow existing protocols when handling hazardous materials posed an ongoing threat to health and safety at the College.

the Act protects two general categories of disclosures: (1) those that evidence an "improper governmental activity"; and (2) those that evidence a "condition that may significantly threaten the health or safety of employees or the public." (§ 8547.2, subd. (e)(1).) When the latter category is implicated, the statutory text imposes only three requirements for protection: (1) the disclosure must be a "good faith communication"; (2) it must "disclose[ ] or demonstrate[ ] an intention to disclose information" about a "condition that may significantly threaten the health or safety of employees or the public"; and (3) the disclosure or intention to disclose must have been "made for the purpose of remedying that condition." (§ 8547.2, subd. (e)(1)(B).) So long as these requirements are met, the statutory text is indifferent to whether the disclosure was made in an administrative context like— as the trial court put it—"asking for resources to address safety concerns." If the disclosure was made in good faith as part of a request for funds to remedy an unsafe condition, the CWPA protects a state employee from retaliation for making the disclosure and funding request.

Indeed, the statutory definition of "protected disclosure" expressly embraces communications made "based on, or when carrying out, job duties." (§ 8547.2, subd. (e)(1).) This is a plainly sensible provision, as it would severely undermine the Act's purpose of encouraging state employees to report threats to public health if those employees whose very job it is to remedy unsafe conditions could be denied whistleblower protection on the ground that they were just doing their job.

26

At the Board's urging, the trial court relied on two cases
—*Patten v. Grant Joint Union High School Dist.* (2005) 134
Cal.App.4th 1378 (*Patten*) and *Levi v. Regents of University of
California* (2017) 15 Cal.App.5th 892 (*Levi*)—for this supposed
"administrative concern" exception. Both cases are materially
different because neither involved a protected disclosure under
the "health or safety" prong of the CWPA. (§ 8547.2, subd.
(e)(1)(B).)

In *Patten*, a junior high school principal brought
a whistleblower claim under Labor Code section 1102.5,
which prohibits retaliation against an employee for disclosing
information to a government or law enforcement agency
" 'where the employee has reasonable cause to believe that the
information discloses a violation of state or federal statute, or
violation or noncompliance with a state or federal regulation.' "
(*Patten, supra,* 134 Cal.App.4th at p. 1381, quoting former
Lab. Code, § 1102.5, subd. (b).)[12] Among other things, she
based her claim on her repeated requests for "additional staff
to keep the campus safe," after a student was assaulted on the
large campus. (*Patten,* at p. 1382.) The *Patten* court concluded
her communications "about needing more staff for safety
purposes [did] not amount to whistleblowing as a matter
of law" because they "were made in an exclusively internal
administrative context" and did "not show any belief on [the
principal's] part that she was disclosing *a violation of state or
federal law* in any sort of whistleblowing context, as required

---

[12] As the *Patten* court noted, Labor Code section 1102.5 was
subsequently amended but, even in its present form, "remains
substantively the same." (*Patten, supra,* 134 Cal.App.4th at
p. 1381.)

27

for a [Labor Code] section 1102.5(b) whistleblowing action." (*Id.* at p. 1385, italics added.) Golshani's claim is obviously different because, unlike the Labor Code statute at issue in *Patten*, the CWPA protects disclosures "made for the purpose of remedying" conditions that threaten "health or safety," even if the state employee is simply carrying out his or her "job duties." (§ 8547.2, subd. (e)(1)(B).)

In *Levi*, a resident program director for the department of ophthalmology at the University of California, San Diego brought a claim for retaliation under the CWPA, alleging, among other things, she was retaliated against for reporting the department chair "created a stressful work environment by yelling, undermining employees' confidence through statements that they were performing poorly, and saying hurtful things." (*Levi, supra,* 15 Cal.App.5th at pp. 894–895, 903–904.) As in *Patten* —but unlike here—she argued the reported conduct violated university policies equivalent to state statutes and thus her complaints were protected under the "improper governmental activities" prong of the CWPA. (*Levi,* at pp. 903–904.) Relying on *Patten*, the *Levi* court rejected the claim, holding "[c]omplaints made 'in the context of internal administrative or personnel actions, rather than in the context of legal violations' do not constitute protected whistleblowing." (*Levi,* at p. 904, citing *Patten, supra,* 134 Cal.App.4th at p. 1385.) Again, Golshani's claim is materially different, because his requests for funding concerned conditions that could threaten health or safety— not purported legal violations—and the evidence, when viewed in the light most favorable to him, was sufficient to show he made the requests "for the purpose of remedying" those conditions. (§ 8547.2, subd. (e)(1)(B).)

28

*Manavian v. Department of Justice* (2018) 28 Cal.App.5th 1127 (*Manavian*) is distinguishable for similar reasons.  As in *Patten* and *Levi*, the plaintiff in *Manavian* asserted claims under Labor Code section 1102.5 and the improper governmental activity prong of the CWPA.  (*Manavian,* at p. 1141.)  The reviewing court held one of the alleged disclosures was not protected under either statute because it "did not disclose any violation of state or federal law or regulation" but communicated "merely a policy dispute."  (*Id.* at pp. 1142–1143.)  The Board suggests *Manavian* stands for the proposition that disclosures made in connection with "internal policy discussions and administrative processes" do not constitute protected activity.  This overstates the *Manavian* court's holding.

In *Manavian*, it was not the context of the communications that made them unprotected; rather, it was the fact that the communications did not meet the statutory definition of a protected disclosure under the Labor Code or CWPA because they "did not disclose any violation of state or federal law or regulation." (*Manavian, supra,* 28 Cal.App.5th at pp. 1142–1143.)  Contrary to the Board's argument, *Manavian* does not suggest that an employee who makes a "good faith" communication "for the purpose of remedying" a "condition that may significantly threaten . . . health or safety" (§ 8547.2, subd. (e)(1)(B)) must be denied protection simply because the communication reflects what can be characterized as a policy difference with the manager who subsequently engages in retaliation.  If an employee believes in good faith that a manager has embraced a policy that threatens the health or safety of CSU employees or the public, the employee must be free to call attention to that policy "without fear of retribution."  (§ 8547.1.)

29

Notwithstanding these distinctions, the Board argues we should nevertheless heed the *Patten* and *Levi* courts' warnings against "creat[ing] a legion of undeserving protected 'whistleblowers' arising from the routine workings and communications of the job site." (*Patten, supra,* 134 Cal.App.4th at p. 1385; *Levi, supra,* 15 Cal.App.5th at p. 904.) Indeed, the Board says our Legislature "appears to have recognized the mischief highlighted" in these cases and thus "added an explicit limitation in section 8547.12 of the CWPA" to prevent it. We agree this "limitation" is relevant, but not in a way that supports the Board's position.

Section 8547.12, subdivision (d) declares that, in authorizing a claim for retaliation, the statute "is not intended to prevent a manager or supervisor from taking . . . personnel action, or from taking or failing to take a personnel action with respect to any university employee . . . if the manager or supervisor reasonably believes any action or inaction is *justified on the basis of evidence separate and apart from the fact that the person has made a protected disclosure.*" (Italics added.) Contrary to the Board's underlying premise, subdivision (d) appears to recognize there will be many circumstances— possibly including some arising from the routine workings and communications of a job site—where a CSU employee may make a "protected disclosure" under the CWPA. However, a protected disclosure *alone* does not create liability, nor should it prevent a manager from taking a discretionary personnel action, so long as that action is "justified on the basis of evidence separate and apart" from the protected disclosure and not in retaliation for it. (§ 8547.12, subd. (d).) Subdivision (d) thus is consistent with both the broad definition of "protected disclosure" set forth in

30

section 8547.2, subdivision (e)(1) and a manager's right to prove, as an affirmative defense, that an "alleged [retaliatory] action would have occurred for legitimate, independent reasons even if the employee had not engaged in protected disclosures." (§ 8547.12, subd. (e).) The subdivision does not evidence an implicit legislative intent to graft an "administrative context" exception on to the unambiguous statutory text. (See *Miklosy, supra,* 44 Cal.4th at p. 888 ["If the statutory language is unambiguous, we presume the Legislature meant what it said, and the plain meaning of the statute controls."]; see also *Kolla's, supra,* 14 Cal.5th at p. 734 [rejecting contention that high court's construction of " 'disclose' " in Labor Code whistleblower statute "threatens 'to convert everyday workplace disputes into whistleblower cases' "; explaining, "protections of [Labor Code] section 1102.5(b) apply only where the disclosing employee 'has reasonable cause to believe that the information discloses a [legal] violation' " and, moreover, "an employer accused of retaliation in violation of section 1102.5(b) can rebut the charge by 'demonstrat[ing] by clear and convincing evidence that the alleged [retaliatory] action would have occurred for legitimate, independent reasons even if the employee had not engaged in [protected] activities' "].)

Finally, there is the investigation that an independent law firm conducted after Golshani filed his administrative complaint with the University. Based on much the same evidence as Golshani produced in opposition to summary judgment—including statements he gave about his " 'many' requests for funding to upgrade the College's safety programs and facilities"—the independent investigator found that Golshani "made a Protected Disclosure" that "potentially involved safety

31

conditions and remedying such conditions at the [College of Engineering] that could threaten the health and safety of employees, students and/or the public."  The Board contends this finding is irrelevant because it "simply" concerned "whether there was a predicate to conduct the investigation at all under the University's [Executive Order] 1116 policy, and did not involve an analysis of the legal requirements for what is a protected disclosure under the CWPA."  (Footnote omitted.) That is not what the evidence shows.

As explained in a report by the CSU Chancellor's Office to Jersky about the investigation's determinations, the investigator made all "relevant findings of fact"—including the finding that Golshani "made a Protected Disclosure as defined by [Executive Order] 1116"—"[u]sing the preponderance of the evidence standard."  Critically, the Chancellor's Office report discloses that Executive Order 1116 defines "Protected Disclosure" exactly as the term is defined in section 8547.2, subdivision (e)(1). The report states, " 'Protected Disclosure' is a good faith communication, including a communication based on, or when carrying out, job duties that discloses or demonstrates an intention to disclose information that may evidence (1) an Improper Government Activity, or (2) any condition that may significantly threaten the health or safety of Employees or the public made for the purpose of remedying that condition." (Boldface omitted.)  Like the independent investigator, we conclude Golshani produced sufficient evidence for a jury reasonably to find he made a protected disclosure under the CWPA.

### 4. *Golshani Produced Sufficient Evidence to Demonstrate His Protected Disclosures Contributed to the Alleged Retaliation*

To establish a prima facie case under the CWPA, an employee must demonstrate causation—specifically, that his or her protected disclosure was a "contributing factor" in an alleged act of retaliation. (§ 8547.12, subd. (e).) To carry this burden, the employee need not prove that the protected disclosure was the *only* reason for an adverse employment action, nor that the employer's stated reason was merely a pretext for prohibited retaliation. Even if the evidence shows "the employer had a genuine, nonretaliatory reason for its adverse action, the plaintiff still carries the burden assigned by statute if it is shown that the employer also had at least one retaliatory reason that was a contributing factor in the action." (*Lawson, supra,* 12 Cal.5th at p. 716 [interpreting evidentiary burdens under Labor Code section 1102.6]; *Scheer, supra,* 76 Cal.App.5th at pp. 915–916 [holding Supreme Court's construction of evidentiary burdens under Labor Code applies to identical statutory language in CWPA].) " ' "A 'contributing factor' includes 'any factor, which alone or in connection with other factors, tends to affect in any way the outcome of the decision.' " ' " (*Lawson,* at p. 714, quoting *Rookaird v. BNSF Ry. Co.* (9th Cir. 2018) 908 F.3d 451, 461.)

The trial court concluded there were no triable issues regarding causation because "[n]one" of the reasons Jersky gave for Golshani's non-retention—safety concerns in the College, the recommendation of Yu for tenure, and Golshani's failure to respect academic hierarchy—"were related to [Golshani's] alleged protected disclosures." The court also noted that Golshani

33

"admitted that he believed" Jersky "blamed him for the College's safety problems," and that Jersky "did not cite [Golshani's] self-audit idea as one of the reasons for why he was not retaining [Golshani] as Dean."

The problem with the court's analysis is it focuses only on Jersky's stated reasons for the adverse employment decision but fails to consider whether there was sufficient evidence to prove Golshani's protected disclosures were *also* a contributing factor in the decision. As we have discussed, it is not enough for an employer to demonstrate it had genuine, nonretaliatory reasons for an adverse employment action. Rather, to obtain summary judgment of a CWPA claim, the employer must negate the causation element of the employee's prima facie case by showing the plaintiff lacks sufficient evidence to prove a protected disclosure was a contributing factor. The employer may do this by showing either that no such evidence exists or that the plaintiff's evidence is irrelevant or otherwise insufficient. The critical point is that the burden does not rest with the employee to show the employer's stated nonretaliatory reasons were pretextual; it rests with the employer to show the plaintiff cannot marshal sufficient evidence to prove the protected disclosure affected the outcome of an adverse employment decision. (*Lawson, supra,* 12 Cal.5th at pp. 714–716.)

The Board attempts to fill this analytic gap by focusing on Jersky's first stated reason for not retaining Golshani as Dean— his purported "poor oversight of safety at the College." The Board emphasizes that it presented evidence showing EHS and Jersky "had concerns about the College's safety culture and Golshani's leadership" as early as 2016 or 2017, which were necessarily unrelated to his idea to perform a self-audit in 2018. Further,

the Board says Golshani's disclosures about auditing the College's safety procedures or needing funds to address ongoing safety hazards "cannot and did not contribute" to any adverse employment action because "all of those 'disclosures' are examples of Golshani purportedly taking some steps toward safety improvement" and therefore these disclosures could not have contributed to the decision not to retain him for failing to address safety adequately.  These arguments do not withstand scrutiny under our prescribed standard of review.

When all doubts and credibility determinations are resolved in his favor, Golshani argues the evidence is sufficient to support a reasonable inference that Jersky retaliated against him by shutting him out of the investigation and decision-making processes after the chemical fire, thereby insulating Jersky from scrutiny for his own failures to address safety issues that Golshani had raised, while also "lay[ing] the groundwork for the pretextual excuses Jersky used to remove Golshani from his position as Dean."  Golshani maintains his evidence—when viewed in the light most favorable to him as the nonmoving party —was sufficient to prove "Jersky had a motive to take actions that discredited Golshani in order to protect Jersky's own interests," as the blame for a major safety incident otherwise might have fallen on Jersky for refusing to provide resources that Golshani had consistently requested in connection with his ongoing "safety complaints and demands."  Because this motive stemmed from his protected disclosures, Golshani argues it satisfies the causation element of his prima facie case for retaliation under the CWPA.  On the record presented, we are compelled to agree.

While there is evidence that EHS and Jersky were concerned about the College's safety culture back in 2016 or 2017, other evidence—including evidence the Board relied on in moving for summary judgment—showed Golshani was "always outspoken about safety issues" since the beginning of Jersky's tenure at the University (and even before then). Moreover, during the 2016 and 2017 periods, the evidence shows Golshani received performance evaluation ratings of "exceeds expectations" from Jersky, which at least casts doubt on the Board's claim that the Provost and EHS were concerned about the Dean's leadership during those years. (See, e.g., *Scheer, supra,* 76 Cal.App.5th at pp. 909, 919 [where plaintiff raised " 'concerns related to patient safety,' " evidence that he "received excellent evaluations" over relevant period "put in issue" employer's claim that he was "terminated for 'poor performance and conduct' "].)

The evidence also shows Golshani had made repeated requests for funds to hire a full-time safety officer and to address other safety hazards in the College during this period, including asbestos removal and the installation of fume hoods, non-skid flooring, and biosafety cabinets in certain labs. However, these requests were largely denied, even after an EHS audit in 2016 confirmed the need to appoint a qualified, full-time safety officer, as conditions in the labs had "reached a potential hazard threshold." Then, the chemical fire occurred in 2018. In the fire's aftermath, Golshani initiated an audit of the College's safety protocols with the intention of identifying and correcting deficiencies that the audit uncovered. Even though it indisputably was Golshani's responsibility to conduct the preliminary investigation under the IIPP, Jersky discouraged

36

him from completing the audit, ultimately securing the Dean's agreement to end it.

After Golshani terminated his audit, EHS conducted its own investigation of the fire. However, while EHS consulted frequently with Jersky, Golshani was entirely excluded from the process and received no information about the investigation's progress or findings. Despite this, Golshani continued to impress upon Jersky the need to hire two full-time safety officers to address lingering gaps in the College's oversight mechanisms. But even after funding was allocated to fill one position, Jersky shut Golshani out of the hiring process and appointed a faculty member from outside the College to head the search committee. Although the new safety officer confirmed that the College —still under Golshani's leadership—managed to remedy all safety issues identified in a 2019 audit conducted by the CSU Chancellor's Office, he quit the job within a year, citing disagreements with leadership that were firmly disputed by Associate Dean Rahai. The safety officer's departure prompted another investigation by EHS in coordination with Jersky, of which Golshani was again kept in the dark. Within a few months, Jersky informed Golshani of the decision not to retain him as Dean.

According to Golshani, this evidence demonstrates "Jersky undertook a pattern of adverse actions" after the fire to undermine Golshani's leadership on safety issues and thereby insulate himself and EHS from scrutiny because Golshani had been "pushing Jersky to provide resources to fix urgent safety concerns that Jersky was unable or unwilling to provide." Although Golshani made largely the same contention in his administrative complaint to the University and in his deposition

testimony—characterizing himself as a "scapegoat" for Jersky's and EHS's failures—the Board appears to have never directly confronted this claim.  While there are other plausible explanations for Jersky's actions, we cannot say that a reasonable jury, presented with the evidence detailed above and resolving material conflicts in Golshani's favor, would be compelled to find that his efforts to investigate and secure funding to address ongoing safety hazards had nothing to do with Jersky's decisions to disempower Golshani after the fire, especially given Jersky's apparent role in denying the funding requests.  Because there are triable issues of material fact, the court erred in concluding Golshani could not establish the causation element of his CWPA claim.

### 5. *The Evidence Raises Disputed Issues of Material Fact Regarding the Board's Affirmative Defense*

Under the CWPA, once an employee demonstrates a prima facie case of retaliation, the burden shifts to the employer or supervisor to prove, as an affirmative defense, "by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in protected disclosures."  (§ 8547.12, subd. (e); see *Lawson, supra,* 12 Cal.5th at p. 712 [analyzing identical " 'same-decision' " "affirmative defense" under Labor Code whistleblower statute].)

"The burden on a defendant moving for summary judgment based upon the assertion of an affirmative defense is heavier than the burden to show one or more elements of the plaintiff's cause of action cannot be established."  (*Anderson v. Metalclad Insulation Corp.* (1999) 72 Cal.App.4th 284, 289 (*Anderson*).)  "Instead of merely submitting evidence to negate a single element

of the plaintiff's cause of action, . . . 'the defendant has the initial burden to show that *undisputed facts* support each element of the affirmative defense.' " (*Ibid.*, italics omitted, italics added.) "The defendant must demonstrate that under no hypothesis is there a material factual issue requiring trial. [Citation.] If the defendant does not meet this burden, the motion must be denied." (*Id.* at pp. 289–290; see also *Fazio v. Fairbanks Ranch Country Club* (2015) 233 Cal.App.4th 1053, 1057 [" 'A defendant moving for summary judgment based upon an affirmative defense . . . bears an overall burden of persuasion that there is a complete defense to the plaintiff's action' . . . [and] must persuade the court there is no triable issue of fact as to that defense."].)

In this case, the same evidence that supports the causation element of Golshani's prima facie case also necessarily precludes summary judgment based on the Board's assertion of its affirmative defense. Because this evidence supports a reasonable inference that Golshani's protected disclosures may have contributed to Jersky's and the University's adverse actions against him, it also necessarily disputes the Board's attempt to prove that the same decisions would have been made even if Golshani had not engaged in the protected activity. (See *Anderson, supra,* 72 Cal.App.4th at p. 292 [to prevail on summary judgment based on an affirmative defense, the defendant must offer "uncontradicted evidence" supporting every element of the defense].)

The Board cites *Vatalaro* for the proposition that, even under the heightened clear and convincing burden of proof, an employer may establish the same-decision affirmative defense on summary judgment. (See *Vatalaro, supra,* 79 Cal.App.5th at p. 386, citing *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–

39

1012 [discussing appellate review of findings made under the clear-and-convincing-evidence standard].) We agree with this proposition as far as it goes, but *Vatalaro* is materially different from our case because there apparently was no evidence offered in *Vatalaro* to demonstrate a protected disclosure was a contributing factor. Rather, because the parties had incorrectly litigated the summary judgment motion under the three-part *McDonnell Douglas* burden-shifting framework, instead of the framework articulated by our Supreme Court in *Lawson*, the plaintiff had directed her opposition to showing only that "the County's stated grounds for [its adverse action] 'lack[ed] credence and competent evidence' and were merely a 'pretext' for retaliation."[13] (*Vatalaro,* at p. 383.) While the reviewing court had "asked the parties to submit supplemental briefing to account for *Lawson,*" it appears the plaintiff again exclusively focused on whether "the County's evidence was insufficient" to prove its same-decision affirmative defense—and not whether she had (or could have) offered evidence to show protected

_____

[13] The *Vatalaro* court explained: The plaintiff's "argument on this point follows from her (and the County's and the trial court's) initial misunderstanding of the governing framework for [Labor Code] section 1102.5 claims. Again, all proceeded on the understanding that an employer could defeat an employee's retaliation claim under section 1102.5 if (1) it showed it had a legitimate, nondiscriminatory reason for the adverse employment action and (2) the employee failed to show its proffered reason was merely a pretext for discrimination. . . . [T]heir understanding was flawed. . . . [A]s the *Lawson* court explained, the employee need not 'show that the employer's nonretaliatory reason was pretextual.' " (*Vatalaro, supra,* 79 Cal.App.5th at p. 383.)

40

activity was a contributing factor in the decision.[14] (*Vatalaro,* at pp. 383–384.)  Ultimately, the *Vatalaro* court determined "the County's *undisputed evidence* would require a reasonable fact finder to find it 'highly probable' " that the County's adverse employment decision "would have occurred for legitimate, independent reasons" even if the plaintiff had not engaged in protected conduct.[15]  (*Id.* at p. 386, italics added.)

Unlike the defendant in *Vatalaro*, the Board moved for summary judgment on the ground that Golshani could not

---

[14]    It is not apparent whether the *Vatalaro* court requested or would have allowed the plaintiff to submit supplemental evidence on the contributory factor issue, given she had—due to the grounds asserted in the County's motion—directed her summary judgment opposition entirely at showing the County's stated reasons were pretextual.  This court faced a similar predicament in *Scheer*.  There, we determined the proper course was to reverse the summary adjudication, as the defendants brought it under the incorrect framework, while observing that the defendants were "not precluded on remand from moving for summary adjudication . . . in accordance with the Labor Code section 1102.6 framework" articulated by our Supreme Court in *Lawson*.  (*Scheer, supra,* 76 Cal.App.5th at p. 915.)

[15]    The Board's other cases are inapplicable because both considered claims under the FEHA retaliation statute (§ 12940) applying the *McDonnell Douglas* framework.  (See *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 62, 68, 77 [applying "three-part test developed in *McDonnell Douglas*" to FEHA retaliation claim, holding the plaintiff failed to produce "substantial evidence of pretext required to avoid summary judgment"]; *Nejadian v. County of Los Angeles* (2019) 40 Cal.App.5th 703, 722, 725–727 [considering retaliation claim under FEHA; holding the plaintiff presented "no evidence" to establish pretext].)

prove causation. And, unlike the plaintiff in *Vatalaro*, Golshani opposed the motion by producing evidence to show his protected disclosures were a contributing factor in the adverse employment decisions that followed. As this evidence was sufficient to support a reasonable inference that protected activity may have caused the adverse action, it also was necessarily sufficient to dispute the Board's affirmative defense that the adverse action would still have been taken, even if Golshani had not engaged in protected activity.

**6.** ***The Trial Court Must Decide on Remand Whether Golshani Should Be Granted Leave to Amend***

After receiving the trial court's tentative ruling granting the Board's summary judgment motion, Golshani moved to amend his complaint to add allegations regarding other protected disclosures that he claimed would "conform the pleadings to the evidence" he offered in opposition to summary judgment. The trial court denied the motion, concluding Golshani's failure to request leave to amend before receiving the court's tentative ruling constituted "unreasonable delay" and "prejudice" to the Board, as allowing the amendment would require the Board "to file another motion for summary judgment."

We conclude the trial court reasonably exercised its discretion based on the circumstances presented. (See, e.g., *Record v. Reason* (1999) 73 Cal.App.4th 472, 486.) However, those circumstances have now changed. In light of our reversal of the summary judgment, should Golshani renew his motion to amend, the trial court must determine whether the same or other factors still warrant departure from our state's liberal policy on allowing amendments. To the extent the trial court

also concluded amendment was unwarranted because the new allegations did not constitute a protected disclosure, the court may need to reexamine that ruling based on the views expressed in this opinion.  We make no judgment on these issues and leave the matter to the trial court's sound discretion on remand.

## DISPOSITION

The judgment is reversed.  Plaintiff Forouzan Golshani is entitled to costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, Acting P. J.

We concur:

ADAMS, J.

HANASONO, J.

43